48 A.3d 1075

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. F.M., DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP OF Q.K.J. AND T.J.J., MINORS.

Argued January 4, 2012—Decided August 14, 2012.

*Beatrix W. Shear,* Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora,* Public Defender Parental Representation, attorney; *Ms. Shear* and *John A. Salois,* Designated Counsel, on the briefs).

*Geraldine O. Livengood,* Senior Deputy Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (*Jeffrey S. Chiesa,* Acting Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Livengood* and *Jaime E. Stofa,* on the briefs).

*Noel C. Devlin,* Assistant Deputy Public Defender argued the cause for respondents Q.K.T. and T.J.J. (*Joseph E. Krakora,* Public Defender, Law Guardian, attorney; *James A. Louis,* Deputy Public Defender, of counsel).

*Jeyanthi C. Rajaraman* submitted a brief on behalf of amicus curiae Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney; *Ms. Rajaraman, Mr. Miller, Monica C. Gural,* and *Mary M. McManus–Smith,* on the brief).

Justice ALBIN delivered the opinion of the Court.

Defendant F.M. (Fernanda) appeals the termination of her parental rights to her now five-year-old daughter, Quinn, and four-year-old son, Troy, Jr.[1] Both children were born of a relationship between Fernanda and T.J. (Troy). The family court found that Troy had committed an act of domestic violence against Fernanda, had an intractable drug-addiction problem, and suffered from mental illness that induced delusional thoughts that he was God. On this basis, the court considered Troy a danger to the physical well-being of the children.

The termination of Fernanda's parental rights was premised on the court's findings that she was incapable and unwilling to protect her children from the dangers presented by Troy. The court

---

[1] To protect the confidentiality of the parties, we use fictitious names.

barred Troy from having unsupervised contact with Quinn, the only child born of their relationship at the time. In violation of court orders and earlier consent agreements with the Division of Youth and Family Services (DYFS or Division), Fernanda allowed Troy to have access to Quinn in her home. Fernanda's inability to shield Quinn from her father led to the child's removal from the home and later to the removal of Troy, Jr. after his birth.

After a four-day guardianship hearing, the family court determined that DYFS established by clear and convincing evidence that the best interests of both children required the termination of Fernanda's parental rights. The Appellate Division affirmed.

First, we determine that the prerequisite for the commencement of termination of parental rights was met in this case—Quinn and Troy, Jr. were both in the "care or custody" of DYFS at the time of the filing of the guardianship complaint. *See* *N.J.S.A.* 30:4C–15(c). We come to this conclusion because Fernanda never raised any objection to "care or custody" before the family court, and therefore she is barred from doing so now based on the doctrine of laches.

Second, we uphold the family court's determination to terminate Fernanda's parental rights. We invest the family court with broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children. We defer to the family court's findings unless they are so wide of the mark that our intervention is required to avert an injustice. So long as the record contains substantial and credible evidence to support the family court's decision, we may not second-guess its judgment. We conclude that the court's findings are adequately supported by the record.

## I.

The record in this case was developed at a four-day termination-of-parental-rights hearing at which four DYFS employees, a psychologist, and Fernanda testified, and dozens of documents, including reports and court orders, were placed into evidence.

## A.

Fernanda began dating Troy when she was fourteen and he was twenty-five years old. She had only completed the eighth grade when, at the age of seventeen, she gave birth to Troy's child, Quinn, in June 2007. At the time, Fernanda lived with her aunt and other family members in a two-bedroom apartment in Paterson. Troy resided with his mother in a home directly behind Fernanda's apartment.

Troy had an extensive criminal record; six years of his young life had been spent behind bars. He suffered from a serious drug-addiction problem and was chronically unemployed. In October 2007, he was diagnosed with "Schizoaffective Disorder Bipolar Type," "Polysubstance Dependence," and "Antisocial Personality Disorder."

On the evening of November 9, 2007, Fernanda called the Paterson Police Department to report a domestic dispute she was having with Troy in her apartment. Quinn, at the time, was five months old. When the police arrived, Fernanda related that Troy had been arguing with her and that she feared that the exchange of words would escalate to a physical assault. Fernanda explained that, several days earlier, Troy had assaulted her, causing minor injuries to her face. She averred in a certification that Troy "put his hand on [her] and busted [her] lip twice." Although Fernanda declined to press charges on her own or to seek a domestic-violence-restraining order, the police arrested Troy, charged him with simple assault, and contacted DYFS. A DYFS investigation then ensued.

On November 16, Fernanda told a DYFS caseworker that the assault occurred after Troy had taken ecstasy pills. She added that Troy's mental illness had recently worsened and that he sometimes talked to himself. In a case plan prepared by DYFS, Fernanda agreed that Troy would not be permitted to enter her home until an assessment was made concerning the risk to Quinn.

Later in November, after interviewing Troy, a DYFS casework-er determined that his "unmedicated mental illness pose[d] a risk to the family." Although the DYFS worker determined that the allegation of child neglect was unfounded—apparently because Quinn was not present during the altercation between Fernanda and Troy—both parents agreed in another case plan that Troy would not have unsupervised contact with Quinn. Troy also agreed to submit to a psychological evaluation and anger-manage-ment counseling. DYFS later arranged for members of the Emergency Child Abuse Program to conduct random visits of Fernanda's home to ensure compliance with the case plan.

Troy's December 10, 2007 substance-abuse assessment revealed an extensive history of drug use—marijuana, cocaine, crack, hallu-cinogens (LSD and PCP), ecstasy, and amphetamines. He also admitted to numerous hospitalizations for psychological and emo-tional problems, including several in the previous month.

The next day, Fernanda reported to a DYFS caseworker that Troy's behavior had grown increasingly erratic. Troy claimed that he was "God and that his kingdom [was] coming" on Decem-ber 25. Additionally, at times, for no apparent reason, he would turn to her and ask why she was "disrespecting him." Although Fernanda did not fear for her or Quinn's safety, she believed that Troy needed to be hospitalized.

The following day, December 12, Troy repeated to a DYFS caseworker that he was God and that his kingdom was coming on December 25. He also said that he had a friend, the biblical Moses, who would help him and that "many influential people in high places" would take care of him. That same day, Troy was diagnosed at St. Joseph's Regional Medical Center as schizophren-ic and released on medication, and Fernanda was warned by a DYFS caseworker that Troy was not to have access to Quinn.

On December 13, the DYFS worker told both Fernanda and her aunt categorically that Troy was not allowed to return to their home or to leave with Quinn. They were instructed that if they

failed to comply, the Division would remove Quinn and place her in a foster home. These warnings were not heeded.

Shortly after midnight on December 14, 2007, a DYFS case-worker responded to Fernanda's apartment based on an anonymous tip that Troy was present there. The worker found Troy in a bedroom watching television. Quinn was asleep and appeared to be in good health. Fernanda explained that she thought Troy's presence was allowed because he had completed a psychiatric evaluation. The caseworker informed the parents that Troy would have to leave and was not permitted to return to the home unless authorized by the Division. They were told that failure to comply would place Quinn at risk of removal from the home. Afterwards, random visits to the home did not reveal a violation of the case plan.

## B.

On December 31, 2007, DYFS filed a verified complaint in the Superior Court, Chancery Division, Family Part, seeking care, custody, and supervision of Quinn pursuant to *N.J.S.A.* 30:4C–12 and *N.J.S.A.* 9:6–8.21 to –8.73. A week later, based on the testimony of a DYFS caseworker at an ex parte hearing, the family court ordered that DYFS be given interim "care and supervision" of Quinn to avoid an "ongoing risk" to the child's "life, safety or health." The show-cause order—captioned as a child abuse-neglect action—was premised on the earlier act of domestic violence, Troy's use of illegal drugs, and his mental instability. The court ordered Fernanda and Troy to show cause on January 28 why "an order should not be entered continuing [Quinn] under the care and supervision of the Division." The court further ordered, among other things, that Troy undergo domestic violence counseling, a psychiatric evaluation, and anger-management training; that he comply with the recommendations of his substance-abuse program; and that he not enter Fernanda's home or have unsupervised contact with Quinn. Fernanda was directed "to comply with

the order restraining [Troy] and notify the authorities and the Division of any violations."

On January 28, 2008, the family court amended its earlier order, this time granting DYFS *custody* as well as care and supervision of Quinn.[2] Under the court's order, Fernanda maintained physical custody of her daughter, and Troy was restrained from entering Fernanda's home and from having any contact with Quinn unless supervised by DYFS. The order provided for services for Troy and Fernanda and evaluations of both. They were warned that a failure to comply with the order might "result in the commencement of a termination of parental rights proceeding." [3]

On February 14, 2008, Eric Kirschner, Ph.D., conducted psychological evaluations of both Troy and Fernanda. Dr. Kirschner determined that Troy's "failure to recognize his psychological impairments and ... to remain in consistent psychiatric care has likely compromised his ability to provide an adequately safe and nurturing environment ... thereby placing his daughter at increased risk for child endangerment." Troy was not receiving any mental health services at the time. Dr. Kirschner expressed "limited confidence" in Troy's "ability to be compliant with recommended services." He concluded that "[w]ithout treatment, the threat of persistent negligence and child endangerment remains prominent."

In Dr. Kirschner's opinion, Fernanda "presented as an individual who was dependent on [Troy] particularly in terms of financial support." She minimized the domestic-violence incident and "denied having any concern about [Troy's] ability to provide a safe and protective environment for" Quinn. Fernanda's responses raised "significant concerns" about her "ability to utilize good

---

[2] The court indicated that its earlier order inadvertently omitted a provision for awarding custody of Quinn to DYFS.

[3] A factfinding hearing was scheduled for April 21, 2008.

judgment thereby posing a heightened risk to her daughter's safety and protection."

On April 8, 2008, during an unannounced visit to Fernanda's apartment, DYFS caseworkers found Troy alone in a bedroom with Quinn, who apparently was asleep. The aunt had let the caseworkers into the apartment; Fernanda was not home at the time. Although ten-month-old Quinn was unharmed, on Fernanda's return, the caseworkers told Fernanda she was in violation of a court order restraining Troy from having contact with Quinn without DYFS supervision. Quinn was removed from the apartment and later placed with foster parents, where she remains to this day.

On April 20, Fernanda gave birth to Troy, Jr., her second child with Troy.[4] Two days later, DYFS executed an emergency removal, taking Troy, Jr. into its custody, see *N.J.S.A.* 9:6–8.29, and ultimately placing him with a foster family that is willing to adopt him.[5] DYFS amended its complaint seeking care, custody, and supervision of Quinn to include Troy, Jr. The complaint alleged that both children were subject to abuse and/or neglect and, in their best interests, removal was necessary for their protection. The family court awarded "care, custody and supervision" of Troy, Jr. to DYFS. Both children remained in the "care or custody" of DYFS until the termination of parental rights of Fernanda and Troy.

At no time before the permanency and guardianship hearings—despite numerous court hearings and court orders—did Fernanda or Troy either challenge the court's award of care, custody, and supervision of Quinn and Troy, Jr. to DYFS or request an abuse

---

[4] On April 21, the date of the previously scheduled factfinding hearing set in the January 28 show-cause order, the court directed that DYFS maintain legal and physical custody of Quinn. Neither Fernanda nor Troy appeared, undoubtedly because of the birth of Troy, Jr. Both parents were granted supervised visitation with Quinn; Troy was restrained from visiting Fernanda's home.

[5] Quinn and Troy, Jr. were placed with different foster families.

and/or neglect hearing. On May 14, Troy signed a consent order in which he admitted that he had violated a court order restraining him from entering Fernanda's home and having unsupervised contact with Quinn. He also stipulated that his conduct constituted abuse or neglect.

## C.

Before and after taking custody of Quinn and Troy, Jr., DYFS offered both Fernanda and Troy assistance and a host of therapeutic and rehabilitative services. DYFS provided necessary prescription medicine to Troy. Fernanda was offered homemaker assistance as part of her case plan. In accordance with the court's orders, DYFS referred Fernanda to Family Intervention Services for weekly one-on-one domestic-violence and parent counseling.[6] The court also ordered Troy to address his mental-health and substance-abuse problems, to complete a substance-abuse assessment and an anger-management program, to undergo domestic-violence counseling, and to submit to psychiatric evaluations. In numerous court orders, Fernanda and Troy were warned that failure to comply with the court-imposed requirements might result in the initiation of an action for the termination of their parental rights.

Compliance review orders issued on May 14, August 7, and December 1, 2008 all required Fernanda and Troy to participate in counseling and parenting-skills training and to fulfill other enumerated requirements.[7] Nevertheless, Fernanda's compliance with these orders was inconsistent at best. For example, Fernanda was terminated from a transitional-housing program that helps mothers develop life skills and obtain job training because, in the view of the program, she did not demonstrate that she was

---

[6] Although the referral was made on April 16, 2008, Fernanda did not attend her first session until May 14.

[7] The order of December 1 temporarily suspended Troy's visitation rights to both children.

capable or desirous of being a responsible parent. Fernanda's participation in Family Intervention Services was characterized as "sporadic" until her case was closed in November 2008 for failure to schedule a session. She did attend a parenting skills group offered by Family Connections, which was also responsible for monitoring her visitation with her children, and she began attending domestic-violence counseling sessions in late December 2008.

## D.

From the beginning, DYFS's primary concerns focused on the threat of domestic violence and the safety of the children, and therefore Fernanda's compliance with the court orders restraining Troy from her home.[8] Because Troy's mental illness and drug-abuse problems remained untreated, the danger that he posed to the children was not abated.[9] Moreover, Fernanda's physical, emotional, and financial dependency on Troy were never severed.

In November 2008, Fernanda moved into her own apartment in Paterson. DYFS received reports that Troy was "staying with her from time to time," and in January 2009 a caseworker made an unannounced visit, finding a sign on the mailbox with Troy's name on it.[10] On a return visit a month later, the sign was gone, but the caseworker discovered men's clothing and toiletries inside. During a counseling session in February 2009, Fernanda admitted that Troy assisted her with rent payments. Indeed, Troy was contributing approximately $700 of the $900 monthly rent payments. On March 4, 2009, an individual reported to DYFS that Fernanda was seen entering her apartment with a man the

[8] On June 11, 2008, when questioned by a DYFS caseworker about a bruise on her left eye, Fernanda responded that she must have hit something.

[9] Troy had also tested positive for cocaine twice in May 2008 and failed to attend a family-engagement meeting regarding permanency at the DYFS office on February 13, 2009.

[10] Fernanda later testified that she had placed the sign on the mailbox in order to receive a package for Troy.

individual believed to be Troy. Fernanda resumed living with her aunt in June 2009 because Troy could no longer provide financial support.

## E.

On March 19, 2009, the family court conducted a permanency hearing to determine whether the goal for the children would be reunification with their parents or adoption.[11] Afterwards, the court approved DYFS's plan to abandon reunification efforts and to initiate proceedings to terminate Fernanda and Troy's parental rights to Quinn, then twenty-one months old, and Troy, Jr., then eleven months old. The court's order explained that termination of parental rights was appropriate because Troy "failed to comply [with] any services to address his mental illness and long standing substance abuse problem" and Fernanda "only recently began to comply [and] make progress [with] ordered services." [12]

## F.

On May 14, 2009, DYFS filed a guardianship petition in accordance with *N.J.S.A.* 30:4C–15, seeking termination of Fernanda and Troy's parental rights to their children.[13] DYFS claimed that termination of parental rights would be in the best interests of the

---

[11] When a child has been temporarily placed with DYFS or another suitable person under either *N.J.S.A.* 30:4C–12 or *N.J.S.A.* 9:6–8.21 to –8.73, a permanency hearing must be held "no later than 12 months after placement." *N.J.S.A.* 9:6–8.54(b); *N.J.S.A.* 30:4C–61.2(a)(2). "The permanency hearing will determine whether the family will continue towards reunification or whether an alternative plan must be adopted." *N.J. Div. of Youth & Family Servs. v. G.M.*, 198 *N.J.* 382, 400, 968 *A.*2d 698 (2009) (citing *N.J.S.A.* 30:4C–61.2).

[12] That day, the court issued a compliance review order continuing to require Troy and Fernanda to participate in various forms of counseling as well as parenting-skills training as referred by DYFS.

[13] The same day, in light of the Title 30 guardianship complaint, the family court issued an order terminating DYFS's Title 9 abuse-or-neglect action. The court also issued a case management order, requiring that Quinn and Troy, Jr. "remain in the care, custody and supervision of the Division." *See N.J. Div. of*

children.[14] *See N.J.S.A.* 30:4C–15(c). The court ordered bonding and psychological evaluations and granted Fernanda supervised visitation with the children.[15]

In July 2009, Donna LoBiondo, M.Div., Ph.D., a psychologist, conducted an analysis of Fernanda's bond with Quinn and Troy, Jr., compared with the foster parents' bond with the children.[16] Dr. LoBiondo observed that Quinn "demonstrated a stronger attachment to both foster parents than to [Fernanda]." Although Quinn "showed happiness at reunification with [Fernanda]," she "chose [her foster father] when faced with a choice between returning to him or to [her] natural mother." According to Dr. LoBiondo, "[t]he bonding data suggest[s] that [Quinn] has come to view [her foster parents] as her psychological parents." Dr. LoBiondo concluded that if Fernanda's relationship with her daughter were to be severed, Quinn "would be unlikely to experience significant or enduring psychological harm."

Dr. LoBiondo came to the same conclusion in the case of Troy, Jr., who "demonstrated a strong attachment to [his foster moth-

*Youth & Family Servs. v. M.M.,* 189 *N.J.* 261, 292, 914 A.2d 1265 (2007) (recognizing that "irrespective of the outcome of the Title 9 hearing, the court had the authority under *N.J.S.A.* 30:4C–12 to retain custody of the child because the child's health and welfare would be at risk if returned to the home").

[14] On March 27, Fernanda gave birth to the couple's third child. The baby was removed from their custody on April 8 and placed in foster care. DYFS sought termination of parental rights to this child in its May 14 complaint. The court, however, denied that relief and converted the matter to one for protective services.

[15] Troy's visitation rights continued to be suspended.

[16] "A bonding evaluation is a specialized type of assessment whose goal is to determine the nature of the child's attachment to birth parents and foster parents, especially to address the question of who occupies the position of greatest centrality in the child's emotional life." Natalie M. Barone et al., *Psychological Bonding Evaluations in Termination of Parental Rights Cases,* 33 J. *Psychiatry & L.* 387, 401–02 (2005) (quoting Frank J. Dyer, *Psychological Consultation in Parental Rights Cases* 112 (The Guilford Press 1999)) (internal quotation marks omitted).

er]," but "no parental attachment" to Fernanda. In her opinion, severing the child's relationship with his foster mother would cause a loss that "is likely to be enduring and potentially harmful." Because Troy, Jr. "does not view [Fernanda] as a parental figure," Dr. LoBiondo maintained that "termination of [Fernanda's] parental rights ... will not result in enduring psychological harm to" the child.

In October 2009, Dr. LoBiondo conducted a court-ordered psychological evaluation of Fernanda. Dr. LoBiondo observed that Fernanda "minimized her partner's drug and violence issues that led to the removal of her children." Indeed, "[w]hen asked if the children were ever harmed, she state[d,] 'they took my kids away so young he never had a chance to hurt them.'" Although Dr. LoBiondo viewed Fernanda as a low risk for committing child abuse, it remained unclear that her parental judgment had improved since she permitted Troy to see the children in violation of court orders. Dr. LoBiondo concluded that Fernanda "is not presently in a position to parent her children" and that it would not be in "their best interest to sever [their] relationships" with their foster parents.

Significantly, during her interview with Dr. LoBiondo, Fernanda claimed that she no longer had any involvement with Troy. However, that assertion, as Dr. LoBiondo noted, was strongly rebutted by the evidence at the time of the interview, and, it appears, by events afterwards. Fernanda and Troy were observed entering Troy's apartment on October 5, walking together on November 30, and standing together on the street where Troy was purportedly purchasing drugs on December 4. Significantly, on the November 30 occasion, Fernanda was pointedly told by a DYFS caseworker that her continued relationship with Troy might "result in her losing her custody case."

## II.

### A.

Over four days in January and February 2010, the family court conducted a termination-of-parental-rights hearing.[17] At the hear-

ing, four DYFS employees and Dr. LoBiondo testified, and a multitude of records and reports were admitted into evidence. Fernanda presented no bonding or psychological expert to rebut the testimony offered by Dr. LoBiondo. Instead, Fernanda testified on her own behalf.

She stated that she was unemployed and residing with her aunt. She denied that she had ever lived with Troy, that he was currently visiting her, or that he ever assaulted her. She conceded that she had violated the DYFS case plan agreement by allowing Troy to be present with her daughter, but now would not permit him to see the children because of his mental disabilities and his drug-abuse problem.

### B.

In March 2010, the family court issued a ruling terminating Fernanda's parental rights to Quinn and Troy, Jr. on the basis of the children's best interests.[18] *See N.J.S.A.* 30:4C–15(c). The court found that DYFS had satisfied by clear and convincing evidence all four factors of the best-interests test set forth in *N.J.S.A.* 30:4C–15.1(a). The court made the following determinations. First, the parental relationship endangered the children's safety, health, or development. Because of Fernanda's commitment to Troy—a drug abuser with significant psychiatric problems—she "failed to protect [Quinn] from [Troy] in the past, and will in all likelihood refuse such protection in the future if the ... children are placed in her custody."

---

[17] Troy's parental rights to both Quinn and Troy, Jr. were terminated based on the entry of a default judgment on October 1, 2009. No appeal was taken from that order.

[18] No one challenged the authority of DYFS to initiate a guardianship hearing on the ground that Quinn and Troy, Jr. were not properly in its "care or custody."

Second, Fernanda was "unable or unwilling to provide a safe and stable home for the [children], and the delay of permanent placement will add to the harm." In assessing factors one and two, the court found Fernanda not to be a credible witness. It rejected her in-court claim that an act of domestic violence had not occurred. It also rejected her assertions that Troy did not live in her Paterson apartment. Additionally, the court believed that Fernanda had made false statements to DYFS caseworkers. Thus, the court maintained that Fernanda "does not hesitate to falsify when necessary in order to protect [Troy]."

On the third prong, the court listed more than nineteen services that DYFS provided Fernanda "to correct the circumstances which led to the placement of the children outside the home." Finally, the court found that, based on Dr. LoBiondo's bonding and psychological evaluations, the fourth prong had been satisfied—that termination would not do more harm than good.

## C.

In an unpublished opinion, the Appellate Division affirmed the judgment terminating Fernanda's parental rights. In upholding that judgment, the panel determined that the family court's "findings and conclusions [were] adequately supported by clear and convincing evidence." The panel, however, did not address an issue raised for the first time in Fernanda's appellate brief—whether DYFS was properly awarded the statutory "care or custody" of Quinn and Troy, Jr., which is a prerequisite to termination under *N.J.S.A.* 30:4C–15(c).

We granted Fernanda's petition for certification. *N.J. Div. of Youth & Family Servs. v. F.M.*, 206 *N.J.* 329, 20 *A.*3d 435 (2011). We also granted the motion of Legal Services of New Jersey (Legal Services) to participate as amicus curiae.

## III.

Fernanda challenges the termination of her parental rights on two grounds. First, she argues that DYFS erred in filing a

guardianship action pursuant to *N.J.S.A.* 30:4C–15(c) without first obtaining "care or custody" of the children through the proper statutory means. She claims that the "care or custody" granted to DYFS was on an emergent, interim basis pending either a factfinding hearing under *N.J.S.A.* 9:6–8.21 to –8.73, or a summary hearing under *N.J.S.A.* 30:4C–12. Because no such factfinding or summary hearing was held and because Fernanda never stipulated to transferring "care or custody" to DYFS, she contends that the court committed plain error in proceeding with a guardianship trial.

Even if the family court properly commenced the guardianship proceedings, Fernanda contends that DYFS did not satisfy the four-part "best interests of the child" test set forth in *N.J.S.A.* 30:4C–15.1(a). In particular, she insists that DYFS failed to prove that Quinn or Troy, Jr. "suffered any harm in [Fernanda's] care or that [Fernanda's] relationship with them endangered their safety, health, or development"; that she was unwilling to eliminate any danger to her children due to her supposed commitment to Troy; that services were offered in support of reunification; or that terminating her parental rights would not do more harm than good to her children.

DYFS counters that Fernanda did not seek a Title 9 factfinding hearing, did not object to the absence of one, and did not object to various court orders directed toward DYFS's therapeutic intervention by obtaining "care or custody" over the children. DYFS maintains that had a Title 9 hearing been scheduled it would have proven abuse and/or neglect, and therefore the absence of such a hearing does not constitute plain error. According to DYFS, Fernanda, who was represented by counsel, chose to accept the reunification services offered to her family—participating in many—both before and after the children's removal from her home. Moreover, DYFS considers Fernanda's decision not to appeal any of the court orders conferring "care or custody" on the Division as evidence that she opted to seek reunification with her children through compliance with the various case plans.

With regard to the guardianship hearing, DYFS argues that it proved by clear and convincing evidence that the children's best interests justified the termination of Fernanda's parental rights under *N.J.S.A.* 30:4C–15.1(a). Specifically, DYFS makes the point that Fernanda exposed her daughter to an unnecessary risk of harm—in violation of case plans and court orders—by failing to shield Quinn from a father prone to domestic violence and plagued by unaddressed drug-abuse problems and untreated mental illness. DYFS insists that it offered numerous services and interventions intended to reunify Fernanda with her children but she did not avail herself of these opportunities. In the end, the children's bonds formed with the foster parents and the need for permanency in their lives satisfied the last factor favoring termination of parental rights.

The law guardian representing both Quinn and Troy, Jr. supports termination of Fernanda's parental rights. The law guardian contends that the mother's claim that DYFS did not have the prerequisite "care or custody" over the children to file for guardianship is barred by the equitable doctrine of laches because of her failure to raise an objection during any of the family court proceedings. The law guardian also believes that termination of parental rights was justified based on Fernanda's failure to comply with case plans and court orders, and her inability to shelter her children from her drug-dependent, mentally ill boyfriend.

Amicus Legal Services of New Jersey opposes termination of parental rights on two grounds. It contends that the family court violated Fernanda's due process rights by allowing DYFS to retain custody of her children for over two years without conducting a "full-fledged fact-finding hearing" to determine whether she committed abuse or neglect contrary to *N.J.S.A.* 9:6–8.21(c). It claims that the court erred by initiating termination proceedings before holding a Title 9 factfinding hearing. Additionally, Legal Services posits that Fernanda's continued relationship with Troy did not constitute "actual proof of harm to [Fernanda's] children" or an inability to parent her children. Legal Services claims that

Fernanda's "interaction with [Troy] did not pose a risk of harm to their children sufficient to warrant a termination of [her] parental rights." In its view, DYFS fell short of proving prong one of *N.J.S.A.* 30:4C–15.1(a), child endangerment.

## IV.

We first address Fernanda's claim that DYFS did not possess the requisite "care or custody" over Quinn and Troy, Jr. that, in this case, was a statutory precondition for the initiation of a guardianship hearing. Fernanda claims that DYFS never properly obtained "care or custody" of the children and, therefore, all the proceedings and findings flowing from that premise, including the guardianship hearing and the termination of her parental rights, are a nullity. Because Fernanda did not challenge the award of "care or custody" of her children to DYFS at any time before the conclusion of the guardianship hearing, we must determine whether she is barred by the doctrine of laches from raising it for the first time on appeal.

## A.

To initiate a guardianship petition with the goal of termination of parental rights, at least one of five grounds set forth in *N.J.S.A.* 30:4C–15(a) to (f) must be met. Here, DYFS has proceeded under subsection 15(c) of the statute. That provision provides that whenever "it appears that the best interests of any child under the *care or custody* of the division require that he be placed under guardianship," *N.J.S.A.* 30:4C–15(c) (emphasis added), "a petition to terminate the parental rights of the child's parents ... shall be filed by [DYFS]," *N.J.S.A.* 30:4C–15(f).[19]

---

[19] DYFS must also file for guardianship of a child if (1) a parent has been convicted "of abuse, abandonment, neglect of or cruelty to such child"; or (2) a parent, whose child has been removed from the home, "has failed for a period of one year to remove the circumstances or conditions that led to the removal or placement of the child"; or (3) "the parent has abandoned the child"; or (4) a parent has been found guilty of various crimes, including "murder, aggravated

*N.J.S.A.* 30:4C–12 outlines procedures for DYFS obtaining "care or custody." If, after DYFS completes an investigation, "it appears that the child requires care and supervision by the [D]ivision," DYFS may apply to the family court "for an order making the child a ward of the court and placing the child under the care and supervision or custody of [DYFS]." *N.J.S.A.* 30:4C–12. The court must then hold a summary hearing, on notice to the parents, and "if satisfied that the best interests of the child so require," it may grant the relief requested by DYFS. *N.J.S.A.* 30:4C–12. Any order granting DYFS care or custody is effective for only six months unless the court, on notice to the parents, conducts another summary hearing and "extends the time of the order." *N.J.S.A.* 30:4C–12.

In addition, if a child's "life, safety, or health will be in imminent danger before notice can be given or a hearing can be held, temporary relief may issue ex parte." *R.* 5:12–1(d); *see R.* 4:67–2(a) (providing for "interim restraint and other appropriate intermediate relief as may be necessary to prevent immediate and irreparable damage"). Thus, if the court finds "that there is reasonable cause to believe a child has been subjected to or will be at risk of abuse or neglect absent such relief," it may confer on DYFS interim care, custody, and/or supervision. *See R.* 5:12–1(d).

The award of "care or custody" of a child to DYFS pursuant to *N.J.S.A.* 30:4C–12 is a stand-alone basis for filing a guardianship complaint under *N.J.S.A.* 30:4C–15(c). "DYFS may bring an action for the termination of parental rights under ... *N.J.S.A.* 30:4C–15 without first bringing an [abuse-or-neglect] action under Title [9]." *N.J. Div. of Youth & Family Servs. v. R.D.*, 207 *N.J.* 88, 112, 23 *A.*3d 352 (2011) (quoting *N.J. Div. of Youth & Family Servs. v. A.P.*, 408 *N.J.Super.* 252, 259, 974 *A.*2d 466 (App.Div.2009), *certif. denied*, 201 *N.J.* 153, 988 *A.*2d 1176 (2010)) (internal quotation marks omitted); *see N.J. Div. of Youth*

---

manslaughter or manslaughter of another child of the parent." *N.J.S.A.* 30:4C–15(a), (d), (e), and (f).

*& Family Servs. v. K.M.*, 136 *N.J.* 546, 556, 643 *A.2d* 987 (1994) ("[T]ermination proceedings, which are brought pursuant to *N.J.S.A.* 30:4C–15, do not *require* a prior determination of abuse or neglect."). Additionally, when DYFS has properly assumed "care or custody" of a child, it may initiate termination proceedings, even if a Title 9 action is pending and no determination of abuse or neglect has been made. *A.P., supra,* 408 *N.J.Super.* at 261, 974 *A.2d* 466 (holding that "DYFS was not required to try [the] Title 9 action to conclusion before filing a Title 30 action for the termination of parental rights").

On January 7, 2008, the family court granted DYFS interim care and supervision of six-month-old Quinn based on Fernanda's failure to abide by DYFS's case plan restraining Troy from having unsupervised contact with his daughter. Following that date, at hearings to determine whether DYFS should continue to maintain care, custody, and supervision of Quinn, Fernanda appeared six times before the family court. On five of those occasions, she was represented by counsel. Before DYFS filed the guardianship complaint, the court entered orders granting DYFS care, custody, and supervision on January 28, 2008; April 21, 2008; April 25, 2008; May 14, 2008; August 7, 2008; December 1, 2008; March 19, 2009—in all, eight orders. The guardianship hearing was held in January and February 2010. Neither Fernanda nor her counsel ever challenged the orders granting DYFS continued care, custody, and supervision at any hearing or at any time before the termination of her parental rights. Fernanda did not refuse the resources and intervention services offered by DYFS.

No one questions that DYFS was required to have "care or custody" of the children before initiating a guardianship complaint in this case. *See N.J.S.A.* 30:4C–15(c). However, for the first time on appeal, Fernanda claimed that DYFS had no right to file a guardianship complaint because DYFS did not have the requisite "care or custody" over Quinn or Troy, Jr., and therefore the four-day guardianship hearing should be declared a nullity. First, Fernanda had notice and an opportunity to be heard—the very

essence of due process. *See In re Commitment of E.D.*, 183 *N.J.* 536, 548, 874 *A.*2d 1075 (2005). Second, at any one of her court appearances, or at any time in between, she could have challenged DYFS's right to assume "care or custody" of her children and demanded a factfinding hearing. This she did not do. By Fernanda's logic, even if DYFS had properly proven at the guardianship hearing that termination of her parental rights was in the best interests of her children, that outcome would have to be reversed because she remained silent about DYFS's purportedly misbegotten assumption of "care or custody." Our law does not compel such an absurd result.

### B.

Fernanda was required to contest whether DYFS had the authority to exercise "care or custody," at the very least, at or about the time of the filing of the guardianship petition. If there is to be a challenge to DYFS's very right to proceed with a termination-of-parental-rights hearing, it must come *before* the hearing. While time is lost, the lives of the children go on, in this case, in the homes of foster families where the children are forming enduring psychological bonds.

Laches is an equitable doctrine that applies when a party sleeps on her rights to the harm or detriment of others. *Fox v. Millman*, 210 *N.J.* 401, 417, 45 *A.*3d 332 (2012). "[L]aches is 'invoked to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party.'" *Id.* at 418, 45 *A.*3d 332 (quoting *Knorr v. Smeal*, 178 *N.J.* 169, 180–81, 836 *A.*2d 794 (2003)). Here, Fernanda had the right to challenge the award of care and custody of the children to DYFS. So long as Fernanda had a sufficient opportunity to assert her claim in the family court, and DYFS proceeded in good faith, having no reason to anticipate the later challenge to "care or custody," the doctrine of laches may be enforced. *See Knorr, supra*, 178 *N.J.* at 181, 836 *A.*2d 794. In deciding whether to apply the doctrine, courts should consider the

length of the delay in a party's assertion of the claim, the reasons given for the delay, and "the 'changing conditions of either or both parties during the delay.'" *Ibid.* (quoting *Lavin v. Bd. of Educ.,* 90 *N.J.* 145, 152, 447 *A.*2d 516 (1982)).

Clearly, DYFS relied in good faith on the belief that it had "care or custody" over the children when (1) it offered resources and services to Fernanda over a period of sixteen months, (2) it removed Quinn and Troy, Jr. and placed them with foster families, (3) it filed a guardianship complaint, and (4) it proceeded with a four-day termination-of-parental-rights hearing—a hearing at which four DYFS workers and a bonding and psychological expert testified. As well, the delay in making the claim resulted in "changing conditions" for the children who, after removal from Fernanda's home, formed strong bonding relationships with foster parents. Indeed, according to Dr. LoBiondo, the children view their foster parents as their psychological parents.

Fernanda has given no explanation for the more than two-year delay in raising the "care or custody" claim or why she did not request the fuller hearing of which she now says she was deprived. We do not know from this record whether strategic reasons came into play in not challenging "care or custody"—whether Fernanda feared that a potentially adverse factfinding might have harmed her chances for reunification with her children. She had the opportunity to challenge DYFS's assumption of care and custody over the children while represented by counsel. Her belated attempt to assert the issue comes much too late. Even if there were merit to the claim, it would be questionable public policy to upend a properly conducted guardianship hearing at which the family court has fairly found that termination of parental rights is in the best interests of the children. Gamesmanship cannot be allowed when the stakes are the lives of children for whom our civil system of justice is seeking permanency. Based on the doctrine of laches, we will not permit Fernanda now to litigate whether DYFS had "care or custody" of her children at the time it filed the guardianship complaint.

We next must determine whether the family court properly terminated Fernanda's parental rights.

## V.

### A.

The issue before the family court was not whether Fernanda was an inherently unfit parent incapable of caring for and raising a child. Rather, it was whether Fernanda was capable of protecting her children from their unstable and potentially violent father, who refused to seek appropriate treatment to curb his drug abuse and address his mental illness.

Parents have a constitutional right to raise their children. *N.J. Div. of Youth & Family Servs. v. E.P.*, 196 *N.J.* 88, 102, 952 *A.*2d 436 (2008). Indeed, it is among the most fundamental of all rights. *Ibid.* But that right is not absolute. It is a right tempered by the State's *parens patriae* responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent. *Ibid.* Severing the ties between a child and a parent is, to be sure, a weapon of last resort in the arsenal of state power. *See In re Guardianship of J.C.*, 129 *N.J.* 1, 7–8, 608 *A.*2d 1312 (1992). Terminating parental rights must be used with caution and care, and only in those circumstances in which proof of parental unfitness is clear. *See E.P., supra,* 196 *N.J.* at 102–03, 952 *A.*2d 436; *In re Adoption of a Child by Benigno–White*, 223 *N.J.Super.* 72, 75, 537 *A.*2d 1345 (Ch.Div.1987) (citing *Santosky v. Kramer*, 455 *U.S.* 745, 787, 102 *S.Ct.* 1388, 1412, 71 *L.Ed.*2d 599, 628 (1982)).

The focus of a termination-of-parental-rights hearing is the best interests of the child. *R.D., supra,* 207 *N.J.* at 110, 23 *A.*3d 352. Because of the fundamental nature of the parent-child relationship, the burden is on the state—here, DYFS—to satisfy by clear and convincing evidence four factors, known as the best-interests-of-the-child test, set forth in *N.J.S.A.* 30:4C–15.1(a). *Id.*

at 113, 23 *A.*3d 352. To justify termination of parental rights, DYFS must establish:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a).]

"Importantly, those four prongs are not 'discrete and separate,' but 'relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests.'" *N.J. Div. of Youth & Family Servs. v. G.L.,* 191 *N.J.* 596, 606–07, 926 *A.*2d 320 (2007) (quoting *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 348, 736 *A.*2d 1246 (1999)).

 Our task as an appellate court is to determine whether the decision of the family court in terminating parental rights is supported by "'substantial and credible evidence' on the record." *N.J. Div. of Youth & Family Servs. v. M.M.,* 189 *N.J.* 261, 279, 914 *A.*2d 1265 (2007) (quoting *In re Guardianship of J.T.,* 269 *N.J.Super.* 172, 188, 634 *A.*2d 1361 (App.Div.1993)). We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family. *Cesare v. Cesare,* 154 *N.J.* 394, 413, 713 *A.*2d 390 (1998). We recognize that the cold record, which we review, can never adequately convey the actual happenings in a courtroom. *E.P., supra,* 196 *N.J.* at 104, 952 *A.*2d 436. We will not overturn a family court's factfindings unless they are so "'wide of the mark'" that our intervention is necessary to correct an injustice. *Ibid.* (quoting *N.J. Div. of Youth & Family Servs. v. G.L.,* 191 *N.J.* 596, 605, 926 *A.*2d 320 (2007)). It is not our place to second-guess or substitute our judgment for that of the family

court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights. *Ibid.*

With these principles in mind, we now review the family court's application of the four-prong test of *N.J.S.A.* 30:4C–15.1(a) to the facts of this case.

### B.

#### 1.

Under prong one of the best-interests test, DYFS must show that the alleged harm "threatens the child's health and will likely have continuing deleterious effects on the child." *K.H.O., supra,* 161 *N.J.* at 352, 736 *A.*2d 1246; *see N.J.S.A.* 30:4C–15.1(a)(1). To satisfy this prong, DYFS does not have to wait "until a child is actually irreparably impaired by parental inattention or neglect." *See In re Guardianship of D.M.H.,* 161 *N.J.* 365, 383, 736 *A.*2d 1261 (1999). Moreover, a mother's relationship with her child's potentially dangerous father may be an appropriate consideration if that relationship poses a clear threat to the child. *See M.M., supra,* 189 *N.J.* at 288–89, 914 *A.*2d 1265. A parent has the obligation to protect a child from harms that can be inflicted by another parent. *See ibid.*

In *M.M.,* we upheld the termination of parental rights of a father who was raising his young son in a home where his wife, who had the intellectual functioning of a seven-year old, created a dangerous and destabilizing environment. *Id.* at 293, 914 *A.*2d 1265. The wife "pose[d] a serious risk to the son because of her substance abuse problems, habitual running away from home, and history of falsely alleging domestic violence," a risk accentuated by the fact that the father worked and was not present to protect the child. *Id.* at 282, 914 *A.*2d 1265.

Unlike in *M.M.,* in *New Jersey Division of Youth and Family Services v. G.L.,* we reversed the termination of parental rights of an able mother, who continued a relationship with a purportedly

dangerous father. 191 *N.J.* at 608–09, 926 *A.*2d 320. There, the mother did not live with the father, allow unsupervised visits with her daughter, or otherwise place her child at risk. *Id.* at 609, 926 *A.*2d 320.

In this case, the family court credited evidence that indicated that Troy had committed an act of domestic violence against Fernanda, an incident that Fernanda would later minimize. Troy had a substantial criminal past, abused drugs, and did not obtain appropriate treatment for his mental illness. He was diagnosed with schizoaffective disorder bipolar type, polysubstance dependence, and antisocial personality disorder. Suffering from delusions, Troy told both Fernanda and a DYFS caseworker that he was God and that his kingdom was coming.

To protect Quinn, DYFS prepared a case plan in which Fernanda agreed that Troy would not have access to Quinn. The family court later entered an order barring Troy from having unsupervised contact with the child. Despite case plans and court orders, Fernanda permitted Troy to have unsupervised contact with her child. Fernanda's commitment to and dependency on Troy overwhelmed her willingness or capacity to protect her child—even when ordered to do so by the court.

In a very telling comment to Dr. LoBiondo, Fernanda stated that DYFS " 'took my kids away so young [Troy] never had a chance to hurt them.' " However, DYFS did not have to wait until Troy, believing that he was God, and while in the grip of a delusion, caused some irreparable injury to his children. The family court determined, based on substantial and credible evidence, that Fernanda "failed to protect [Quinn] from [Troy] in the past, and will in all likelihood refuse such protection in the future if the ... children are placed in her custody." The record also supports the family court's finding that Quinn and Troy, if returned to the home, would continue to be "harmed by ... virtue of [Fernanda's] commitment to [Troy]."

Mental illness, alone, does not disqualify a parent from raising a child. But it is a different matter if a parent refuses to treat his

mental illness, the mental illness poses a real threat to a child, and the other parent—here, Fernanda—is unwilling or incapable of following court orders to shield her child from that danger.

We find that there is substantial and credible evidence to support the family court's finding on prong one.

2.

The second prong, in many ways, addresses considerations touched on in prong one. Here, the focus is on whether "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child." *N.J.S.A.* 30:4C–15.1(a)(2). Stated differently, the inquiry centers on whether the parent is able to remove the danger facing the child. *K.H.O., supra,* 161 *N.J.* at 352, 736 *A.*2d 1246. This prong can be satisfied by establishing that a parent is unable to protect a child from the dangers posed by another parent, and therefore unable to provide a stable and protective home. *M.M., supra,* 189 *N.J.* at 289, 914 *A.*2d 1265.

The family court determined that Fernanda was unable or unwilling to shield her children from a person who clearly presented a risk of harm to her children. Ultimately, Fernanda chose her commitment to Troy over the safety of her children. Allowing Quinn to have unsupervised contact with Troy was evidence that Fernanda lacked the capacity to eliminate potential harm to Quinn and later Troy, Jr. In the eyes of the court, Fernanda's repeated denials of a continuing relationship with Troy, despite substantial evidence proving otherwise, and her recantation of domestic violence made her an incredible witness, and thus generally untrustworthy.

Prong two may also be satisfied if "the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents." *K.H.O., supra,* 161 *N.J.* at 363, 736 *A.*2d 1246. Quinn was removed from Fernanda's home in April 2008 when she was ten months old. She has lived with the same foster family ever since and formed deep and

abiding attachments with her foster mother and father. Troy, Jr. was removed from Fernanda's care when he was only days old and now lives with a foster family prepared to adopt him. Fernanda's parental irresponsibility has caused, over time, her children to view others as their psychological parents.

The record supports the court's finding that Fernanda's unwavering commitment to Troy and her unwillingness to deny him unsupervised access to the children demonstrate her "inability to provide a stable and protective home." *See id.* at 353, 736 *A.*2d 1246.

### 3.

The third prong requires an evaluation of whether DYFS "made reasonable efforts to provide services to help the parent" remedy the circumstances that led to removal of the children from the home. *N.J.S.A.* 30:4C–15.1(a)(3). The emphasis here is on the steps taken by DYFS toward the goal of reunification. *K.H.O., supra,* 161 *N.J.* at 354, 736 *A.*2d 1246. "The diligence of DYFS's efforts on behalf of a parent is not measured by" whether those efforts were successful. *D.M.H., supra,* 161 *N.J.* at 393, 736 *A.*2d 1261. " 'Reasonable efforts' may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." *M.M., supra,* 189 *N.J.* at 281, 914 *A.*2d 1265. Experience tells us that even DYFS's best efforts may not be sufficient to salvage a parental relationship.

The family court expressed that DYFS made "more than reasonable efforts in terms of services to [Fernanda]." It enumerated nineteen resources and services provided to Fernanda and her children in support of reunification, including the purchase of family necessities, such as a refrigerator, crib, and children's play equipment; parenting classes; domestic violence counseling; access to a transitional living program; psychological evaluations; supervised visitation with her children; and Family Intervention Services.

With regard to this prong, the court concluded that DYFS "made reasonable efforts to provide services to help [Fernanda]" reunite with her family and that there were no available alternatives to termination. We find that the record supports that determination.

4.

 Last, the fourth prong—whether termination of parental rights will do more harm than good—is a "fail-safe" inquiry guarding against an inappropriate or premature termination of parental rights. *See G.L., supra,* 191 *N.J.* at 609, 926 *A.2d* 320; *N.J.S.A.* 30:4C–15.1(a)(4). "[T]o satisfy the fourth prong, the State should offer testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." *M.M., supra,* 189 *N.J.* at 281, 914 *A.2d* 1265 (quoting *J.C., supra,* 129 *N.J.* at 19, 608 *A.2d* 1312). Under this prong, an important consideration is "[a] child's need for permanency." *Ibid.* Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered.

Dr. LoBiondo conducted bonding evaluations between the children and Fernanda and the children and their foster parents. From her observations and analysis, Dr. LoBiondo formed the opinion that the foster parents had become the psychological parents of Quinn and Troy, Jr. and that to sever those bonds, at this point, would cause both children enduring harm. Fernanda did not offer expert testimony to rebut Dr. LoBiondo's findings that both Quinn and Troy, Jr., held a stronger attachment to their foster parents than to her.

Troy, Jr., now age four, was removed from his mother's custody when he was just days old and Quinn when she was ten months old. Their lives have gone on. Their need to know that they have a permanent home is critical to their emotional development. The

court held that termination of Fernanda's parental rights would not do more harm than good.

We conclude that the record contains substantial and credible evidence to support the court's findings on all four prongs of the best-interests-of-the-child test. The decision to terminate parental rights is not so wide of the mark and falls squarely within the permissible bounds of discretion accorded to the family court.

## VI.

For the reasons expressed, we affirm the judgment of the Appellate Division, which upheld the family court's decision to terminate Fernanda's parental rights.

*For affirmance*—Chief Justice RABNER, justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judge WEFING (temporarily assigned)—6.

*Opposed*—None.