# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1190-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.A.M.,

     Defendant,

and

J.J.C.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.C.,

     a Minor.

_____

Submitted November 18, 2019 – Decided December 19, 2019

Before Judges Messano and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FG-15-0040-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Dianne Glenn, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Amy B. Klauber, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant J.J.C. appeals from the Family Part's October 29, 2018 order that terminated his parental rights to his son, A.C. (Adam), who was born in 2008.[1] Defendant argues that the Division of Child Protection and Permanency (the Division) failed to prove prongs two, three, and four of the statutory best-interests-of-the-child test, N.J.S.A. 30:4C-15.1(a). Those portions of the statute require that the Division prove:

---

[1] We use initials and fictitious names to preserve the confidentiality of the child and parties. R. 1:38-3(d)(12). The judgment of guardianship also terminated the parental rights of Adam's mother, defendant S.A.M. (Samantha). She has not appealed.

(2)    The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3)    The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4)    Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a)(2)-(4).]

The Division's proof as to all must be clear and convincing. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 113 (2011)).

The Division contends that the evidence at trial was sufficient and urges us to affirm the judgment. Adam's Law Guardian agrees and, contrary to the position taken at trial, similarly argues we must affirm. Having consider the arguments in light of the record and applicable legal standards, we affirm, substantially for the reasons expressed by the trial judge, Madelin F. Einbinder, in her oral opinion.

3

I.

On September 22, 2016, the Division received a referral from Adam's school alleging that he told school personnel Samantha had been arrested. The school also reported that Adam was always "dirty" when he arrived at school. Although the Division had received an earlier 2015 referral, its investigation at that time failed to substantiate allegations that the child's parents used drugs in his presence. The Division offered evaluation services at the time, but defendant and Samantha never attended appointments.

Upon receipt of the school's September 2016 referral, Division workers investigated the home and found it in deplorable condition, without electricity, running water and with little food. At the time, Adam was living with Samantha alone; defendant resided elsewhere. The Division contacted defendant, who responded to the scene. He refused to take custody of his son, claiming there was not enough room in the apartment he shared with his girlfriend. The Division effected a Dodd removal.[2]

Defendants supplied the names of relatives with whom Adam might be placed, however, when contacted by the Division, they all refused to accept

---

[2] A "Dodd removal" refers to the emergency removal of a child from the home without a court order pursuant to the Dodd Act, N.J.S.A. 9:6-8.29.

custody of the child. The Division would not approve placement with two other relatives based on their experience with the Division, and placed Adam in the home of a resource family.

Neither defendant attended the guardianship trial on October 29, 2018. The Division's caseworker, Emmy Cubbage, testified that defendant and Samantha regularly attended supervised visitation with Adam, although defendant missed several visits in fall 2016 because he was incarcerated. Adam showed affection with both parents and was emotional when he had to leave and return to his resource family. Courtney Vainojoe from the Division's Adoption Unit, who was assigned to the case in February 2018, testified that both defendant and Samantha sometimes appeared to be under the influence during therapeutic visitations and were resistant to discussing some of the topics presented by the therapist. As of the time of trial, Adam refused to attend visitation with his parents, stating he was upset with their behavior.

Defendant reunited with Samantha shortly after Adam's removal, but later moved in with his parents. When they sold their home, defendant became homeless, and, at the time of trial, he and Samantha were living in an abandoned van. The caseworkers both testified regarding the Division's efforts to assist

5

with housing services, but defendant failed to attend scheduled meetings and otherwise never followed through with social service agencies.

Defendant tested positive for cocaine at his initial urine screening in October 2016, but he successfully attended intensive outpatient treatment and made progress treating his addiction. Urine screens between November 2016 and July 2017 were negative, but, in August 2017, defendant tested positive for suboxone. He had no prescription for the drug. His probation officer and Division staff noted defendant frequently appeared to be under the influence. Although defendant again began treatment, his initial compliance soon faltered. He failed to complete the intensive outpatient program, refused to re-engage in any other referrals and refused to provide additional urine screens or submit to hair follicle testing.

Adam manifested significant health problems and allergies. His school provided him an individualized educational plan to address his learning difficulties and ADHD. He also exhibited serious behavioral problems. At the time of trial, Adam was in his fourth foster home since removal, this time with a maternal great aunt, T.F. She remained willing to care for Adam but did not wish to adopt him or participate in kinship legal guardianship (KLG). Even after

A-1190-18T2

Adam was placed with T.F., the Division continued to explore other relatives as possible placement alternatives and potential pre-adoptive homes.

The Division's expert, Dr. David Brandwein, a forensic psychologist, evaluated defendant and conducted a bonding evaluation with Adam and his parents. Dr. Brandwein diagnosed defendant with "opioid use disorder, severe; cocaine use disorder, moderate; paranoid, antisocial, and narcissistic personality patterns; and inadequate housing." The doctor concluded that while defendant loved his son, his obvious drug use, failure to remain sober and continued denial of his problems made it unlikely he would be able to independently parent the child in the foreseeable future.

Dr. Brandwein testified that Adam saw defendant and Samantha as his parents and there was a definite bond between them. However, the doctor opined that the bond was not secure. Because defendant had been "in and out of [Adam's] life" for the prior two years, the absences caused that bond to weaken. Dr. Brandwein acknowledged that he might have recommended giving the relationship more time if defendant re-engaged in treatment. However, because Adam had been in foster care for a long time, the doctor opined within a reasonable degree of psychological certainty that termination of defendant's parental rights would not do more harm than good to Adam. He admitted there

7

was no certainty that Adam would find a permanent home, but Dr. Brandwein believed that Adam faced greater harm by waiting for his parents who were not as invested in him as he was in them.

Neither defendant called any witnesses nor presented any evidence. Adam's Law Guardian addressed the judge and explained that based on conversations with the child, Adam's adamant desire was to maintain an intact relationship with his parents.

In an oral opinion that immediately followed trial, and which we discuss more fully below, Judge Einbinder concluded the Division had carried its burden of proof as to all four prongs of N.J.S.A. 30:4C-15.1(a) and entered the judgment of guardianship. This appeal followed.

II.

Under our standard of review, we must uphold the trial court's findings if "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). We defer to the judge's factual findings because she had "the opportunity to make first-hand credibility judgments about the witnesses . . . [and] ha[d] a 'feel of the case' that can never be realized by a review of the cold record." E.P., 196 N.J. at 104 (quoting N.J.

Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).  We accord even greater deference to the Family Part's factual findings because of its "special jurisdiction and expertise in family matters[.]"  N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)).  "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice."  E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)).

"The focus of a termination-of-parental-rights hearing is the best interests of the child."  F.M., 211 N.J. at 447 (citing R.D., 207 N.J. at 110).  The four statutory prongs "are neither discrete nor separate.  They overlap to provide a composite picture of what may be necessary to advance the best interests of the child[]."  M.M., 189 N.J. at 280 (quoting N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005)).

A.

Defendant argues he consistently complied with substance abuse treatment and therefore displayed a willingness to eliminate any harm caused to

Adam. This contention is supported by the Division's failure to produce any positive drug screens after he left the last treatment program in 2018.

The second prong "inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451 (citing In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999)). This prong may be proven by "indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, [and] the inability to provide a stable and protective home[.]" K.H.O., 161 N.J. at 353. "Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents.'" F.M., 211 N.J. at 451 (quoting K.H.O., 161 N.J. at 363).

Judge Einbinder found that both defendant and Samantha were "unwilling or unable to eliminate the harm" Adam faced. She noted that defendant was "homeless" and had "no[t] complied consistently with substance abuse treatment." She cited Dr. Brandwein's unopposed expert opinion that Adam would "continue to be endangered by the parental relationship." We note that the lack of any empirical proof of defendant's continued use or abstinence after leaving the last program in 2018 is the result of his refusal to submit to further testing.

There was ample, credible evidence in the record to support the judge's conclusion, and we reject defendant's challenge to the sufficiency of the prong two proof.

B.

Defendant's argument regarding prong three is limited. He does not contend the Division failed to provide reasonable services toward reunification, but rather, defendant argues there was a viable placement option for Adam with a relative, C.F., Samantha's sister. Defendant claims the Division failed to reasonably consider her as a placement resource.

Prong three requires the court to "consider[] alternatives to termination of parental rights[.]" N.J.S.A. 30:4C-15.1(a)(3). Such alternatives may include placement of the child with a relative caretaker, N.J.S.A. 30:4C-12.1(a), or the establishment of KLG, N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 222 (2010). The Division has an obligation under N.J.S.A. 30:4C-12.1(a) to initiate a search for relatives who may be willing and able to provide care and support for a child. N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 81 (App. Div. 2013). Defendant's argument in this regard, however, lacks sufficient merit to warrant extended discussion. R. 2:11-3(e)(1)(E).

The testimony at trial was that shortly after the Division removed Adam, C.F. expressed an interest in caring for him. The Division cleared C.F. for a resource placement, however, at the time, Adam was doing well in his foster placement and Samantha requested he not be moved. C.F. agreed that Adam should not be placed in her home at that time. After the Division placed Adam with T.F. shortly before trial, it again contacted C.F. to ask if she was willing to take the child. She stated she was unable to do so and subsequently refused to return calls or attend appointments. The Division ruled her out as a placement.

Additionally, Judge Einbinder found that T.F. told the Division that she was not interested in KLG or adoption. The proof as to prong three was sufficient.

## C.

The fourth prong of the statute requires the court to determine that termination "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). It serves as a "'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453 (quoting G.L., 191 N.J. at 609). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108.

A-1190-18T2

Typically, "the [Division] should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281).

Judges face exquisitely difficult decisions when, as here, the child has been through several resource family placements and resides at the time of trial with a resource parent unwilling to adopt him. As the Court has said:

> [C]ourts have recognized that terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child. Such harm may occur when a child is cycled through multiple foster homes after a parent's rights are severed. Indeed, the detriment may be greater than keeping the parent-child relationship intact since the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place. We know that termination of parental rights does not always result in permanent placement of the child and that too many children freed up for adoption do not in the end find permanent homes.
>
> [E.P., 196 N.J. at 109 (quotations and citations omitted).]

Defendant argues that Adam has a significant emotional relationship with him, and the judge should have conducted an in camera interview of Adam to consider his wishes. However, the judge asked the Law Guardian if she intended to call the child as a witness, "or have him come in and speak with the Court[.]"

13

She specifically declined. We refuse to consider an issue claimed to be error when the court specifically adopted a position at counsel's urging. See M.C. III, 201 N.J. at 340 (applying invited error doctrine).

Because of Adam's behavioral problems, defendant posits that the possibility of adoption is remote, consigning his son to a revolving door of resource home placements. Judge Einbinder was clearly concerned that the Division had not yet secured a pre-adoptive placement for Adam. Nevertheless, relying largely on Dr. Brandwein's expert opinion, she concluded termination "would not do more harm than good[.]" The judge differentiated the facts in this case from those presented in E.P., noting in that case, the child had an intense bond with her mother, the defendant, whereas here, because of defendant's absence and incarceration, the bond between Adam and his father was less strong than previously.

We also think this case presents other facts that compel a different result than in E.P. In E.P., the nearly thirteen-year-old child was in her seventh foster placement at the time of trial with "no permanent placement . . . in sight." 196 N.J. at 109. Here, the Division's caseworker testified that a pre-adoptive home was going to be evaluated the week after trial. We have no idea what the results of that were. Nevertheless, the point is that the possibility of permanency for

14

Adam is unlike that faced by the child in <u>E.P.</u>, whose "slim hope of adoption" appeared as "elusive" as ever.  <u>Ibid.</u>[3]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3]  The Law Guardian's position on appeal, as noted, is different from that expressed at trial.  Although no motion to supplement the record was ever made, the Law Guardian's appellate brief states in a footnote that at the time the brief was filed, Adam was "placed in a pre-adoptive home where he wishes to remain, and therefore now supports the affirmance of the judgment of guardianship." The footnote is not critical to our decision.

A-1190-18T2