# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2620-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.D.W.,

     Defendant-Appellant,

and

J.W. and A.W.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.Z.M.W.
AND Z.L.H.,

     Minors.

_____

       Submitted January 16, 2019 – Decided February 28, 2019

       Before Judges Accurso and Vernoia.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0047-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Britt J. Salmon-Dhawan, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Salima E. Burke, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Toya Davis, Designated Counsel, on the brief).

PER CURIAM

Defendant T.D.W. (Tara),[1] appeals from a January 24, 2018 Family Part Judgment of Guardianship terminating her parental rights to her son, M.Z.M.W. (Matt), who was born in 2007, and daughter, Z.L.H. (Zelda), born in 2013.[2] Based on our review of the evidence in light of the applicable law, we affirm the order terminating Tara's parental rights to Zelda and continuing Matt in the care

---

[1] We employ initials and pseudonyms for the parties and children for clarity and to protect the children's privacy. Defendant has a third child, A.W. (Ariel), who was born in 2017 and is in the custody of the New Jersey Division of Child Protection and Permanency. Ariel was not the subject of this proceeding.

[2] The January 24, 2018 order terminated the parental rights of Matt's father, J.W., and Zelda's father, A.W. They have not appealed.

A-2620-17T2

and custody of the New Jersey Division of Child Protection and Permanency, but reverse the termination of Tara's parental rights to Matt.

I.

The New Jersey Division of Child Protection and Permanency first became involved with Tara in August 2012 when it responded to an abuse and neglect allegation after Tara tested positive for marijuana and was terminated from a home shelter program where she lived with five-year-old Matt. During the following two years, the Division received an additional referral following Tara and Matt's eviction from another shelter, and provided services, including substance abuse evaluations and treatment to address Tara's use of marijuana.

In January 2013, Tara advised the Division she was pregnant. The Division referred Tara to a counseling service, but she declined. Tara began substance treatment in February 2013, initially tested positive on five occasions and then tested negative and completed treatment in May. By that time, Tara and Matt had stable housing with her then paramour, A.H. The following month, Zelda was born.

Eight months later, in April 2014, a Division caseworker contacted Tara after learning she failed to take Zelda for well-child visits with a doctor. Tara subsequently failed to bring Zelda to two doctor's appointments the Division

3

scheduled.  The caseworker continued to attempt to contact Tara but was unable to do so because she and the children had been evicted from their home. Division representatives went to Matt's school and were informed he had been absent for a number of days.

Tara subsequently contacted the Division and provided her current address.  Tara brought Zelda for a well-child visit the Division arranged, and the Division closed its case on June 2, 2014.

Less than a week later, the Division received referral from Matt's school advising that after he returned following his absence, he had a black eye and said his mother hit him.  He provided unclear and conflicting information to the Division caseworker and a police officer concerning his injuries, later saying his black eye was not the result of being hit by his mother.  He also was unable to explain what caused a missing front tooth.

The Division's efforts to discuss Matt's injuries with Tara were at first unsuccessful because she did not respond to the Division's phone calls and no one answered the door at Tara's home.  After two days, Tara responded and was informed the Division wanted her and the children to appear at the Child Advocacy Center.  A Division caseworker went to Tara's home to transport the

family, but she prevented the caseworker from completing a safety assessment of the home.

During an interview at the Center, Matt denied ever having a black eye but said one of his mothers, either Tara or A.H., told him to lie and say he hurt his eye by falling. He reported he was told he would be arrested unless he lied about the incident. Then seven-year-old Matt repeatedly asked the officers if he was going to be arrested.

Tara refused permission to allow a doctor to examine Matt. The Division executed an emergency removal of Matt and Zelda from Tara's care. After a brief stay with a family friend, the children were placed together in a non-relative resource home.

On June 13, 2014, the Division filed a verified complaint and order to show cause for care and custody of the children. The court entered an order finding removal of the children was required due to the use of excessive corporal punishment, awarding the Division custody and appointing a Law Guardian for the children.

During a subsequent interview with Tara, she told the Division Matt was injured when he fell in the bath tub, but that she was not home when it occurred.

A-2620-17T2

A.H. said she was home when Matt fell in the tub and injured his eye but was in another room at the time.[3]

Matt was examined by a doctor and said A.H. hit him in the eye. He explained that A.H. was angry at him for jumping up and down while Tara and A.H. fought. He also said he lost a tooth when he fell after being pushed from behind by either Tara or A.H. The doctor recommended that Tara and A.H. receive psychological evaluations and parenting training, and attend anger management counseling.

The court directed that Tara's and A.H.'s parenting time be supervised. Matt reported to a Division caseworker that he feared A.H. and thought she would hit him again if he returned home. When informed of Matt's fears, Tara said he was lying to get attention.

---

[3] In Point II of her reply brief, Tara argues the trial court improperly relied on Matt's reports concerning A.H. Tara claims Matt's statements constitute inadmissible hearsay and are otherwise unreliable because his "special needs limit his ability to retell accurately his experiences." The Division moved to strike Point II of the reply brief, claiming it asserts an argument that was not made to the trial court or in Tara's initial brief, and contradicts Tara's consistently stated position and testimony at trial that A.H. caused Matt's injuries. In the alternative, the Division requested permission to file a sur-reply brief. The determination of whether to consider the arguments in Point II of the reply brief and the Division's sur-reply brief was left to the merit's panel. We have considered the arguments in both briefs in our determination of this appeal.

On July 25, 2014, the court ordered the continued custody of the children with the Division and directed that Tara and A.H. undergo psychological evaluations, parenting skills training and comply with Division recommendations. The court ordered supervised parenting time for Tara and denied parenting time with Matt to A.H.

Tara and A.H. underwent psychological evaluations. Tara's diagnoses included post-traumatic stress disorder, depressive disorder and parent-child relationship issues. It was recommended that Tara receive trauma-focused cognitive behavioral therapy and parenting skills training and find employment to provide income to support her children. It was also recommended that A.H. attend parenting skills classes and attend counseling. Continued supervised parenting time for Tara and A.H. was recommended with a plan for gradual transition to unsupervised parenting time. The Division offered Tara services to address her mental health and housing issues.

At a September 22, 2014 case management and fact-finding conference, Tara stipulated that she failed to supervise Matt when he was struck and injured by A.H. The court ordered that Tara and A.H. comply with Division services, undergo psychological evaluations and attend parenting classes. A.H. was

ordered to attend anger management classes. The court directed parenting time for Tara consistent with the recommendations of her therapist.

During the ensuing months, the court entered orders continuing the Division's care and custody of the children and directing that Tara and A.H. comply with Division services. It was agreed Tara would have unsupervised parenting time, but the court required that A.H. be supervised while with the children. Following a March 31, 2015 compliance review hearing, the court allowed overnight weekend parenting time for Tara.

On May 26, 2015, Matt's therapist reported to the Division that Matt was not fed during an overnight visit with Tara. The resource parent also reported the children were very hungry when they returned home. Matt told his therapist that he and Zelda were left alone with A.H. during the visit while Tara went to work. A Division investigator found little food in the home just prior to a planned overnight parenting visit and, during a subsequent visit to the home, Tara would not permit the investigator to look in the refrigerator. The Division found the allegation Tara neglected the children by leaving them alone with A.H. to be established, but determined the alleged failure to feed Matt to be not established.

In June 2015, Matt's therapist reported that Matt had "regressed since starting weekend visits" with Tara and A.H. A month later, the therapist informed the Division that she did not recommend reunification of the children with Tara until either A.H. was no longer in the home or A.H. actively participated in therapy. The therapist reported that Matt said he was afraid A.H. would hit him and that he overate before and after his visits with Tara because he did not get enough food when he was with her.

During a June 26, 2015 compliance review hearing, the court again ordered a psychological evaluation for Tara and that she comply with services. Tara advised that A.H. no longer resided in the home, but requested that she be permitted to supervise A.H.'s contact with the children. The court ordered that A.H. not be present for Tara's parenting time. A.H. refused any Division services and requested to be dismissed from the proceedings. The court granted the request and terminated A.H. from the litigation. The court also entered a permanency order stating the Division's reunification plan was acceptable.

Tara's counselor reported that during the summer of 2015, Tara made "little progress in therapy" and had not addressed the traumatic experiences in her life. The counselor found Tara was angry about attending counseling and did not accept responsibility for her role in the children's placement in foster

care. Tara also refused her counselor's request to speak with Matt's therapist. During July and August, Tara did not attend two of three scheduled therapeutic visiting sessions with Matt.

In early August 2015, Tara refused to let the Division caseworker into her home. On August 17, 2015, Matt reported he was not fed during an overnight visit with Tara. A caseworker went to Tara's home, but she would not allow him to enter.

In September 2015, it was discovered that Tara was living with a new paramour, L.S., who refused to provide the Division with any information permitting an investigation of his background. Tara failed to attend a court ordered meeting with medical professionals to discuss medication options for Matt's numerous special needs. In late September, Matt's counselor recommended that the child's weekend visitation with Tara end until she actively participated in therapy.

On September 29, 2015, the court ordered that Tara attend psychological counseling and parenting classes and comply with Division services. The court suspended Tara's overnight parenting time and permitted only supervised parenting time until she complied with services, and required Division access to her home and its assessment of all others residing in the home.

In early October 2015, the children's resource parent suffered from health issues and could no longer care for them. The Division was unable to find a placement for the children together, and Matt and Zelda were placed in separate resource homes.[4]

The Division arranged for supervised parenting time for Tara and the children, and continued family therapy sessions for Tara and Matt. Tara, however, did not attend all of the scheduled family therapy sessions. On October 5, 2015, Tara was discharged from Catholic Charities for failure to attend counseling. In October, she was also fired from her job and postponed the Division's home assessment for one week. In November 2015, Tara cancelled a Division home visit.

On December 16, 2015, Tara failed to attend a compliance review hearing. The court ordered the Division continued care and custody of Matt and Zelda because Tara was unable to care for them. The court ordered that Tara comply with services, attend treatment and allow the Division access to her home. The court continued the cessation of overnight visits until Tara engaged in counseling.

---

[4] Since May 2017, Ariel has resided in the same resource home as Zelda.

A-2620-17T2

In December 2015, Tara began counseling with Dr. Jeffrey B. Allen. She also participated in family counseling with Dr. Allen, Matt and Zelda. Four months later, the court entered an order allowing Tara unsupervised visits with the children but denying weekend visits.

In February 2016, Tara provided the Division with five relatives in North Carolina to assess for placement of the children. None of the relatives responded to the Division or expressed interest in providing placement for the children. During the course of this matter, the Division also contacted a friend identified by Tara and Tara's aunt, C.B., who for a period supervised Tara's parenting time with the children, to determine their availabilities as placement options. Both declined. The Division also contacted Matt's godmother, M.M., as a placement for Matt, but M.M. had pending criminal charges against her.

In February, Matt underwent a developmental assessment at the Children's Specialized Hospital. It was determined Matt suffered from attention-deficit-hyperactivity-disorder, with developmental articulation and language disorder. It was recommended that he engage in speech therapy and have a child-study team evaluation.

On March 4, 2016, Tara attended a Division family team meeting where she was encouraged to attend counseling and take the other steps required for

reunification with her children. Tara committed to complying with Division services to ensure reunification occurred. Later in the month, the court ordered a psychological evaluation of Tara and that she continue to attend individual and family counseling and parenting classes.

A month later, the court issued another permanency order accepting the Division's plan for reunification. The court observed that Tara was then engaged in services, had stable housing and was employed.

In June 2016, however, Matt's resource parents reported to the Division that they noticed a change in his behavior since Tara's unsupervised visitation had been reinstated. According to the resource parents, nine-year-old Matt often lied and wet the bed at night and himself during the day.

During an August 2016 visit to Tara's home, a Division caseworker found almost no food. A month later, Tara was evicted. She was without stable housing until January 2017, when she began to cohabitate with a new paramour, M.C. Tara continued to have unsupervised parenting time through the fall of 2016.

On October 20, 2016, Tara informed a Division caseworker she was living with a neighbor because she was evicted from her prior residence due to non-payment of rent. During a November 22, 2016 visit to Tara's aunt's home where

Tara was spending time the children, a Division caseworker heard loud crying from inside of the home. The children later reported the crying occurred because Tara hit three-year-old Zelda on the leg.

In January 2017, the court allowed for a transition to unsupervised overnight parenting time contingent on the therapeutic recommendations of Dr. Allen and the consent of the Law Guardian. Two weeks later, Tara gave birth to Ariel. The Division, however, received a referral that Ariel tested positive for marijuana. Tara reported to the Division she intended to raise Ariel with M.C., with whom she was residing in housing M.C. obtained through a program for individuals with mental illness. The Division determined M.C. had an extensive criminal history, including convictions for aggravated assault, criminal sexual contact and possession of controlled dangerous substances.

On February 8, 2017, the Division filed an amended verified complaint seeking custody of Ariel. The court entered an order granting the Division custody of Ariel, who was placed in the same resource home as Zelda. On February 22, 2017, Tara attended an intake appointment for a substance abuse program and, five days later, she tested positive for marijuana.

At a March 9, 2017 family team meeting, the Division changed its plan from reunification to termination of parental rights. In a March 28, 2017 order,

the court directed that Tara and M.C. undergo substance abuse evaluations. The court also entered a permanency order accepting the Division's plan for termination of parental rights followed by adoption. The court observed that Matt and Zelda had been in resource home placements for three years, that Tara had failed to remediate the issues that required the placements and she continued to test positive for controlled dangerous substances.

Dr. Allen reported that Tara had "become more passive about . . . her current situation" and never advised him she used marijuana during her pregnancy with Ariel. He noted Tara began missing appointments with him in April and he closed his file on her case two months later due to her non-attendance.

In April and May 2017, Dr. Jonathan H. Mack conducted a psychological examination of Tara and bonding evaluations of Zelda and Tara, and Zelda and her foster mother. Dr. Mack diagnosed Tara with "Posttraumatic Stress Disorder, Chronic"; "Major Depressive Disorder, Recurrent, Severe"; "Cannabis Use Disorder, Moderate"; "Victim of Child Sexual Abuse, Subsequent Encounter"; and "Borderline Personality features." He opined that although Tara had tried to work toward reunification, based on her history, mental health

issues and the results of his bonding evaluations, it was in Zelda's best interests to terminate Tara's parental rights and allow the child to be adopted.

In the spring of 2017, the supervisor for Tara's visits with the children was no longer available, and the Division arranged for therapeutic supervised parenting time. From May through July, Tara attended five visits but failed to confirm three others, which were then cancelled. Reinstatement of unsupervised parenting time was never recommended.

The guardianship complaint was filed on June 19, 2017. At a compliance review hearing the following day, the court ordered Tara to comply with random drug screens because she had not completed the ordered substance abuse assessment. The assessment was completed in late July, and Tara was referred for outpatient treatment.

Meanwhile, although M.C. informed the Division in February 2017 that he would submit to random drug screens and a substance abuse evaluation, he had not done so by April. The substance abuse treatment facility closed M.C.'s case in May 2017 after he missed three scheduled evaluations.

Dr. Mack's office conducted psychological bonding evaluations between Matt and his foster parents in September 2017. Dr. Mack opined that Matt had symptoms associated with children who experienced repeated trauma, including

wetting the bed, frightening dreams, lying, excessive worrying and fear. Dr. Mack found Matt's symptoms were founded on trauma related to Tara. He concluded that Matt will thrive with his foster parents, and supported the termination of Tara's parental rights. However, he also noted that the foster parents were unsure if they were interested in adopting Matt and they had indicated only that they were considering pursuing adoption.

The guardianship trial took place over four days. The Division presented the testimony of Division caseworkers India Duncan and Gino Hutchinson, as well as Dr. Mack, who testified as an expert in clinical psychology and neuro-psychology. Tara testified on her own behalf. The Law Guardian supported the Division's request for termination of Tara's parental rights, arguing the Division satisfied its burden of establishing termination of parental rights was in the children's best interests.

Following the trial, the court rendered an oral opinion detailing the testimony of the witnesses and evidence presented. The judge found the Division's witnesses to be credible, and concluded Tara's testimony "contradict[ed]" the credible testimony of the Division's witnesses and was "self-serving" and "unsubstantiated" and therefore given "little weight."

The court concluded the Division presented clear and convincing evidence establishing each of the prongs of the statutory best-interests standard, N.J.S.A. 30:4C-15.1, and concluded Tara's parental rights to Matt and Zelda should be terminated. More specifically, the court found the children's health, safety and development have been or will continue to be endangered by a parental relationship with Tara because she allowed the children to be exposed to A.H. before and after the court ordered that A.H. should only have supervised contact with the children, and she planned to continue to expose the children to harm by living with M.C., who has a significant criminal record. The court further found that Tara has unremediated mental health issues, otherwise failed for three-and-a-half years to take the steps necessary to provide a safe home for the children and sabotaged her own efforts each time she otherwise made progress toward unsupervised parenting time and possible reunification. The court noted Dr. Mack's testimony explaining the harms the children have suffered due to their relationship with Tara and the delays in permanency resulting from Tara's refusal and inability to provide the children with a safe and stable home.

The court also found the Division established Tara was either unable or unwilling to provide the children with a safe and stable home, noting Tara lacks any plan to provide housing for the children or otherwise provide for their care,

and lacks empathy for the children, choosing paramours that pose risks to the children's safety and well-being over her children's welfare. The judge further explained that Tara's inability and unwillingness to eliminate the harm to the children is evidenced by her lengthy and consistent failure to successfully engage in Division services and her ongoing use of marijuana during and after her pregnancy with Ariel. The judge also found that further delay in providing permanency to the children will exacerbate the harm the children will suffer from separation from their resource parents.

The court next detailed the Division's extensive and continuous provision of services provided to Tara during the three-and-a-half years following the children's removal from Tara's custody. The court explained that from June 2014 through April 2017, the Division's goal was reunification and that the evidence established a pattern that, whenever progress was made, Tara took steps that were anathema to reunification. The court found that despite the numerous services provided, Tara was unable to provide a stable home for herself or her children and incapable of addressing Matt's many special needs.

Last, the judge determined the Division established that termination of parental rights will not do more harm than good. The judge relied on Dr. Mack's testimony, which she found credible, that children require permanency to thrive

A-2620-17T2

and develop and that Tara has denied the children the permanency they have found with their resource parents. The judge cited Dr. Mack's testimony that the children are thriving in their resource homes and have progressed mentally and psychologically in the care of the resource parents. The court accepted Dr. Mack's testimony that termination of Tara's parental rights will provide the children with permanency through adoption by their resource parents and support their continued care in safe and healthy environments.

The court entered the January 24, 2018 Judgment of Guardianship terminating Tara's parental rights to Matt and Zelda. This appeal followed.

Tara presents the following arguments for our consideration:

THE JUDGMENT OF GUARDIANSHIP SHOULD BE REVERSED BECAUSE THE TRIAL COURT ERRED IN FINDING THAT ALL FOUR PRONGS OF THE N.J.S.A. 30:4C-15.1(a) BEST INTERESTS TEST FOR THE TERMINATION OF T.D.W.'S PARENTAL RIGHTS HAD BEEN MET BY CLEAR AND CONVINCING EVIDENCE[.]

I. THE TRIAL COURT ERRED IN FINDING THAT DCPP SATISFIED THE FIRST PRONG OF THE BEST INTERESTS TEST BECAUSE DCPP DID NOT PROVE THAT T.D.W.'S PARENTAL RELATIONSHIP HARMED OR PUT HER CHILDREN AT A CONTINUING RISK OF HARM[.]

II. THE COURT'S FINDING THAT T.D.W. WAS UNABLE TO OR UNWILLING TO ELIMINATE

THE HARM FACING HER CHILD WAS ERRONEOUS[.]

III. T.D.W.'S PARENTAL RIGHTS SHOULD BE REVERSED BECAUSE TERMINATION WILL DO MORE HARM THAN GOOD[.]

IV. TERMINATION OF PARENTAL RIGHTS SHOULD NOT BE AFFIRMED WHERE THE CHILDREN'S LAW GUARDIAN ABANDONED HER APPOINTED ROLE, IGNORING THE LEGAL PROTECTIONS DESIGNED FOR THE CHILDREN[.]

II.

Our review of a trial court order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015) (citing N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012)). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448. This enhanced deference is particularly appropriate where the court's findings are founded upon the credibility of the

21

witnesses' testimony.  N.J. Div. of Youth & Family Servs. v. H.B., 375 N.J. Super. 148, 172 (App. Div. 2005) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605).  No deference is given to the trial court's interpretation of the law, which we review de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

A parent has a constitutionally protected right "to enjoy a relationship with his or her child." In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999).  That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447.  A parent's interest must, at times, yield to the State's obligation to protect children from harm.  N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009).

When terminating parental rights, the court must consider the "best interests of the child." K.H.O., 161 N.J. at 347.  The Division's petition to

terminate parental rights may only be granted if the following four prongs enumerated in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence:

> (1)   The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)   The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3)   The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4)   Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "[T]he cornerstone of the inquiry [under N.J.S.A. 30:4C-15.1(a)] is not

whether the biological parents are fit but whether they can cease causing their child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

Tara does not dispute that the Division presented clear and convincing evidence establishing the third prong of the statutory standard. She concedes the Division made reasonable efforts to provide the services necessary to assist her in correcting the circumstances that led to the children's placement. See N.J.S.A. 30:4C-15.1(a)(3); see also In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999) (explaining the Division's efforts to provide services are "not measured by their success . . . . These efforts must be assessed against the standard of adequacy in light of all the circumstances of a given case."). Instead, she argues there is insufficient evidence supporting the court's findings of the first, second and fourth prongs of the best-interests standard.

When considering the first prong, the court's focus is not "on a single or isolated harm or past harm," but rather "on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. Here, the court's determination that the children's health, safety and development have been or will be endangered by the parental relationship is supported by the evidence. After three-and-a-half years of services, Tara continues to be unable to provide the children with permanency

24

in a safe and stable home due to her unremediated mental health and substance abuse issues, poor decision-making, lack of stable employment and housing, and preference for residing with paramours who pose risks to the children. See K.H.O., 161 N.J. at 356 (finding a parent's "inability to provide any nurturing or care for [a child] for [a] prolonged period is harm . . . that is cognizable under the best interests standard"). Moreover, Dr. Mack's testimony explained and established that the children have suffered and will continue to suffer harm from their relationship with Tara.

The second prong of the best-interests standard "relates to parental unfitness," which may be established by demonstrating that: (1) "the parent is 'unwilling or unable to eliminate the harm'"; or (2) "the parent has failed to provide a 'safe and stable home'" and "a 'delay in permanent placement' will further harm the child." Id. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). The inquiry is "whether that parent can raise the child without inflicting any further harm." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006).

To be sure, there is evidence Tara would like to provide a safe and stable home for the children and has, on occasion, taken steps to do so. "Concern and efforts by a natural parent after his or her child has been removed from the home,

and making genuine and successful efforts to overcome the cause of the removal is of enormous significance" when determining fitness. N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 437 (App. Div. 2009). However, Tara has consistently abandoned her efforts to address the issues requiring the placement of the children due to bad judgment, mental health and substance abuse issues and poor decision-making. Over a three-and-a-half-year period, Tara demonstrated she is both unwilling and unable to address and resolve the issues in order to eliminate the harm to the children and provide for them a safe and stable home. There is no basis to conclude the court's finding as to the second prong of the standard is "so 'clearly mistaken' or 'wide of the mark'" that we should intervene to ensure against a denial of justice. E.P., 196 N.J. at 104 (quoting G.L., 191 N.J. at 605). To the contrary, the finding is amply supported by the evidence the court found credible.

We next consider Tara's assertion the Division failed to present sufficient evidence establishing that termination of her parental rights will not do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). Prong four "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. Under the fourth prong of the best-interests standard, "[t]he question ultimately is not whether a biological mother or father is a worthy

parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108. The Division and the Law Guardian argue the court correctly concluded termination of Tara's parental rights will not do more harm than good because the children have strong bonds to their respective resource parents that will mitigate against the termination of Tara's parental bond and the resource parents provide permanency to the children through adoption.

Termination of parental rights poses a risk to children due to the severing of the relationship with their natural parents, but it is based "on the paramount need the children have for permanent and defined parent-child relationships." K.H.O., 161 N.J. at 355 (quoting In re Guardianship of J.C., 129 N.J. 1, 26 (1992)). Thus, "the fourth prong of the best interests standard [does not] require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid. "[T]he question to be addressed under [prong four] is whether, after considering and balancing the two relationships, the child[ren] will suffer a greater harm from the termination of ties with [their] natural parents than from permanent disruption of [their] relationship with [their] foster parents." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 181 (2010) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002)).

Dr. Mack generally testified the children were "well bonded to their [respective] foster parents," in part due to Tara's inability to care for the children "for a long period of time." He also opined that the children's respective resource parents "would be able to mitigate any harm that termination of parental rights might cause," and that Tara would be unable "[o]ver the long term" "to mitigate the harm posed to the children should their bonds with the[ir] resource parents be broken." Dr. Mack further explained that Tara's parenting capacity was not "likely to change in the foreseeable future" and the children were "at the point where [they] need stability and . . . permanency and . . . the type of consistency that is being provided to them by their current caretakers." Dr. Mack's testimony, which the court found credible, is uncontroverted.

The evidence also showed that Zelda's resource parent planned to adopt the child, thereby providing the permanency Dr. Mack relied upon to support his opinion that the termination of Tara's parental rights to Zelda will not do more harm than good. We are therefore convinced the court correctly determined the Division presented clear and convincing evidence establishing prong four of the best interests standard for the termination of Tara's rights to Zelda.

We are not, however, convinced the evidence supports the court's finding the Division clearly and convincingly established that termination of Tara's parental rights to Matt will not do more harm than good. In assessing the relative harms resulting from the termination of Tara's parental rights, the court found Matt's resource parents offered him permanency because they made a "commitment" to adopt him. That finding is undermined by the record.

In his August 3, 2017 report concerning his bonding evaluation of Tara and Matt, Dr. Mack opined that it was in Matt's best interest "to be adopted by" Zelda and Ariel's resource parent, even though Matt has never lived with the resource parent and no bonding evaluation between Matt and the resource parent had been conducted. Three months later, Dr. Mack's opinion changed.

In his November 1, 2017 report, Dr. Mack explained that Matt's resource parents reported they fostered Matt with the understanding he would be reunited with Tara, placed with a member of her family or adopted by Zelda's resource mother. Thus, they fostered Matt without a "frame of mind" that they might adopt him and were surprised when their possible adoption of Matt was proposed.

Matt's resource parents also indicated they needed time to consider whether they would adopt and wanted to see how Matt "is going to progress."

The resource mother has told Matt she is "not ready yet" to adopt him. Indeed, in Dr. Mack's report, he states that although Matt has thrived in his resource parents' care, they "are unsure if they will pursue adoption and they feel pressured to make an immediate decision." Dr. Mack recommended that the resource parents "be given adequate time and support to come to a decision regarding adoption." At trial, there was no evidence Matt's resource parents decided to adopt him and Dr. Mack did not address the potential harm to Matt if Tara's parental rights are terminated and his resource parents opt not to adopt him.

Nevertheless, at trial Dr. Mack offered the following "recommendation . . . of what is in [Matt's] best interest for permanency": "[b]eing adopted by his current [resource] parents." And the court's conclusion, and the Division and Law Guardian's argument, that termination of Tara's parental rights to Matt would not do more harm than good are grounded on the premise that Matt will gain permanency through adoption by his resource parents.[5]

_____

[5] Dr. Mack's August 3, 2017 report recommends termination of Tara's parental rights in favor of Matt's adoption by Zelda and Ariel's resource parent. The court, however, did not find the Division proved termination of Tara's parental rights to Matt will not do more harm than good based on the permanency that might be offered if Zelda and Ariel's resource parent adopted Matt. Moreover, there is no expert testimony supporting a finding that termination of Tara's

Matt's need for permanency is particularly acute because, according to Dr. Mack, Matt suffers from numerous issues, including chronic nocturnal enuresis and anxiety, directly related to his uncertainty about the permanency of his placement. "[A] child's need for permanency is an extremely important consideration" in the determination of the fourth prong of the best interests standard. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 559 (2014). A "decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future." E.P., 196 N.J. at 108 (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 610 (1986)). Accordingly, a court's analysis "must necessarily include a discussion of a child's prospects of permanency as terminating parental rights without any compensating benefit, such as adoption, may do great harm

_____

parental rights to Matt in favor of an adoption by Zelda and Ariel's resource mother will not do more harm than good. K.H.O., 161 N.J. at 355 (explaining that a determination of whether "a child will suffer a greater harm from the termination of ties with [his] natural parents than from the permanent disruption of [his] relationship with foster parents" "'necessarily requires expert inquiry specifically directed to the strength of each relationship'" (quoting J.C., 129 N.J. at 25)).

A-2620-17T2

to a child." N.J. Div. of Youth & Family Servs. v. L.M., 430 N.J. Super. 428, 450 (App. Div. 2013).

The court's analysis of the compensating benefits of the termination of Tara's parental rights to Matt and the resulting severance of the bond she has with the child rests on the unsupported premise that Matt will find permanency through adoption by his resource parents.[6]  As noted, however, Matt's resource parents were unprepared to make a commitment to adopt, "unsure" if they would adopt and their decision to adopt, at least in part, depended on Matt's "progress." Thus, terminating Tara's parental rights may present a "detriment . . . greater . . . since the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place." E.P., 196 N.J. at 109 (quoting A.W., 103 N.J. at 611).

---

[6] We recognize that proving permanency through adoption is not essential to a finding that termination of parental rights will not do more harm than good under the fourth prong of the best interests standard.  See, e.g., A.W., 103 N.J. at 611 (noting termination of parental rights may be warranted although no immediate prospect of adoption exists).  Here, however, it is the purported permanency through adoption by Matt's resource parents upon which the Division and Law Guardian rely to support their argument that termination of Tara's parental rights will not do more harm than good, and the court's finding on prong four is based on its determination that Matt will obtain permanency through adoption by his resource parents.

We are therefore constrained to conclude the Division failed to establish by clear and convincing evidence the fourth prong of the best interests standard as to Matt. We reverse the order terminating Tara's parental rights to Matt without prejudice, but affirm the order continuing Matt in the care and custody of the Division. See, e.g., G.L., 191 N.J. at 607-09 (finding failure to establish each of the four prongs of the best interests standard by clear and convincing evidence requires reversal of an order terminating parental rights).

Those portions of the judgment of guardianship terminating Tara's parental rights to Zelda and continuing Matt in the care and custody of the Division are affirmed. The termination of Tara's parental rights to Matt is reversed without prejudice. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2620-17T2