# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1044-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

A.M.W.,

 Defendant,

and

R.A.S., SR.,

 Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF R.A.S.,
JR. and E.R.S., minors.

_____

Submitted October 11, 2023 – Decided November 15, 2023

Before Judges Natali and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0102-22.

Joseph E. Krakora, Public Defender, attorney for appellant (Meghan K. Gulczynski, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Wesley Hanna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant R.A.S., Sr. (Richard) appeals from the November 14, 2022 judgment of guardianship terminating his parental rights to his children, R.A.S., Jr. (Ricky), born in 2009, and E.R.S. (Erica), born in 2010.[1] The children's biological mother, defendant A.M.W. (Aileen), does not appeal from the guardianship judgment terminating her parental rights. The Law Guardian supports the termination on appeal as it did before the trial court.

---

[1] We use initials and pseudonyms to identify the parties, children, and others to protect the children's privacy and because records relating to Division proceedings held pursuant to Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

A-1044-22

Based on our review of the record, the court's extensive findings of fact and conclusions of law, and defendant's arguments, we are convinced the court correctly determined the Division of Child Protection and Permanency (Division) proved by clear and convincing evidence termination of Richard's parental rights is in the children's best interests. We therefore affirm.

I.

The facts and procedural history of the underlying matter are fully set forth in Judge Michael A. Jimenez's sixty-page opinion, which we incorporate by reference. We highlight the following facts relevant to this appeal and, although this appeal only concerns Richard, we will discuss Aileen where pertinent.

The Division first became involved with the family in 2012, on a report of concerns about Richard and Aileen's mental health and substance abuse, which the Division ultimately deemed unfounded. Over the course of the next eight years, the Division received and investigated fourteen[2] additional referrals regarding Richard, Aileen, or both defendants, involving concerns about their mental health, substance abuse, and care of Ricky and Erica. All but two of the

_____

[2] Although the trial court's opinion indicates fourteen referrals, by our count there were fifteen in total.

allegations were deemed unfounded or not established. Throughout its involvement with the family, the Division offered services and referrals to both defendants to assist them in addressing their mental health, substance abuse, domestic violence and parenting issues. Richard did not participate meaningfully in any treatment and continually tested positive for illicit substances.

In September 2012, the Division substantiated an allegation of abuse and neglect against Aileen. Based on both defendants' positive drug tests and failure to comply with recommended services, along with Aileen's failure to self-administer prescribed medication, the Division executed an emergency Dodd removal.[3] The Division was awarded custody of Ricky and Erica, who were initially placed with a non-relative resource home with defendants having supervised visitation. Eight months later, Ricky and Erica were placed with Aileen's mother Dolores, who supervised the visits. The children remained with Dolores for the next year and a half, when they were reunified with defendants. Although the pending litigation was dismissed, Richard's visits with the children

---

[3] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

remained supervised.  Under a related docket, joint legal custody of the children was granted to Dolores, Richard and Aileen.

In February 2016, the Division was again granted care and supervision of Ricky and Erica based on defendants' mental health and substance abuse issues. Six weeks later, when the Division received another referral with similar concerns, Richard refused to be interviewed or comply with the Division's investigation or recommendations.  The litigation was dismissed in December 2017, with Dolores, Richard and Aileen maintaining joint legal and physical custody of the children.

In March 2019, the Division was again granted care and supervision of Ricky and Erica based on defendants' unresolved mental health and substance abuse issues, along with their non-compliance with services.

In May 2019, the Division substantiated an allegation of neglect against defendants based on domestic violence.  Specifically, Richard hit Aileen in the face in the presence of the children, who later reported fearing Richard would kill Aileen.  Richard was subsequently discharged from mandatory substance abuse treatment for failing to appear and continued to test positive for marijuana and cocaine.

A-1044-22

In December 2019, Alison Strasser Winston, Ph.D., conducted a forensic psychological/parenting evaluation of Richard, who presented with an extensive history of substance and alcohol abuse, which impacted his overall functioning and ability to parent the children. The evaluation found Richard to be highly angry and untrusting; he lacked adequate resources to manage stressful or challenging situations and instead chose to self-medicate with illicit substances. Although Richard had an emotional attachment to his children, his antisocial personality characteristics and anger issues impaired his ability to parent and empathize with them. Dr. Winston diagnosed Richard with bipolar disorder, antisocial personality disorder, and severe cannabis use disorder. She recommended Richard be restrained from the home until he complied with services and "adequately reduced the risk he posed to his children," and that his contact with the children be supervised for the foreseeable future. She also recommended substance abuse treatment, couples counseling, parenting training and therapy with the children.

In January 2020, Samiris Sostre, M.D. conducted a psychiatric evaluation of Richard. Her findings were consistent with Dr. Winston's evaluation, in that Richard endorsed symptoms of irritability, anger and frustration. Although he tried to manage his anger issues with marijuana, Dr. Sostre found this strategy

6

ineffective because he continued to have ongoing anger outbursts. She diagnosed him with bipolar disorder, impulse control disorder and antisocial personality disorder. Dr. Sostre also recommended mental health treatment and medication, classes in anger management and batterer's intervention, but noted that individuals with antisocial personality disorder respond "very poorly" to treatment and "the prognosis is poor."

Based on the ongoing concerns regarding defendants' unabated substance abuse, in May 2020 the court again granted the Division custody of Ricky and Erica, placed them with Dolores, and banned Richard from the residence. A week later, the court permitted therapeutic visits through Catholic Charities; Richard attended one visit and then was incarcerated.

The court conducted a fact-finding hearing in September regarding another domestic violence incident that occurred in January 2020. Although it did not sustain a finding of abuse and neglect, the court determined it was in the children's best interests to continue their custody, care and supervision with the Division. Within three months, both defendants moved to Pennsylvania.

On May 21, 2021, the court entered a permanency order approving the Division's plan of termination of parental rights due to defendant's continued mental health and substance abuse issues, for which neither parent took

A-1044-22

significant steps to address despite the Division's reasonable efforts. On September 29, 2021, the court entered a permanency order approving the plan of termination of parental rights followed by relative resource home adoption.

The guardianship trial was conducted over the course of three days before Judge Jimenez. The Division presented the testimony of Dr. Sostre, an expert in psychiatry and substance abuse; Dr. Jennifer Pacyon, an expert in neuropsychological and forensic assessments; Dr. Winston, an expert in clinical psychology; Lauren Burgos, the Division caseworker; and Dolores. Richard did not present any witnesses.

Judge Jimenez subsequently issued a thorough written decision detailing defendants' prior history with the Division. He summarized the procedural history and made detailed findings of fact as to each of the required elements of the best-interests-of-the-child standard set forth in N.J.S.A. 30:4C-15.1(a). Based on those findings, Judge Jimenez concluded the Division sustained its burden of proving by clear and convincing evidence it was in Ricky's and Erica's respective best interests to terminate defendants' parental rights.

The judge accepted the testimony of the Division's experts, who testified consistent with their prior evaluations of Richard. The judge also considered the testimony of the caseworker and Dolores, and concluded the Division had

proven by clear and convincing evidence reunification was not feasible.  He found "it would not be safe to return the children to [defendants], now or in the foreseeable future, due to the extensive history of substance abuse, unaddressed mental health issues, ongoing domestic violence concerns and both parents['] lack of insight into the harm their conduct has and continues to cause their children."

The judge noted Ricky and Erica had been in the physical and legal custody of the Division for two years preceding the litigation, having been removed from defendants for the second time.  He noted that the harm to the children was "not one egregious harm, but a series of harms that have taken place over time" because of untreated mental health issues, substance abuse and domestic violence.  Both Dr. Sostre and Dr. Winston testified about Richard's poor judgment, untreated mental health issues, domestic violence, absence of anger management and lack of desire to stop using substances and address these longstanding, pervasive issues.  Dr. Winston further testified of the harm to Ricky and Erica caused by their parents' mental illness, substance abuse and domestic violence.

Judge Jimenez found Richard had not taken any meaningful steps to address the issues that resulted in Ricky's and Erica's removal.  Since its first

9

involvement in 2012, the Division had offered an "ampl[e] array of services" to Richard, including substance abuse treatment programs and mental health services. He refused to participate, instead continuing his "insatiable desire to use illicit drugs." The court also noted defendants did not have safe and stable housing. At the time of the hearing, they were living in a "vacant, unoccupied home that is under construction," having previously resided in a tent.

Judge Jimenez also considered Dr. Winston's bonding evaluations, during which she observed Ricky's and Erica's strong emotional attachment to Dolores. Although the children also had a "positive emotional bond" with Richard, it was not a "strong and secure emotional attachment." Dr. Winston opined, and the judge found, that removing the children from Dolores would cause them "serious and enduring emotional harm."

Judge Jimenez also found the Division had made reasonable efforts to provide services directed at addressing Richard's mental health, substance abuse and domestic violence issues, even after he had moved to Pennsylvania. The judge further considered Dolores's testimony that she wanted to adopt the children and was not amenable to kinship legal guardianship (KLG) "because she believe[d] adoption is the best way to protect the children." Thus, he found there was no alternative to termination of parental rights.

10

Finally, Judge Jimenez considered Richard's inability to parent now or in the foreseeable future, along with Ricky's and Erica's need for permanency and their bond to Dolores, in whose care they were thriving. He found the Division's testimony and evidence demonstrated that the termination of parental rights would not do more harm than good, and adoption by Dolores was in the children's best interests.

On appeal, Richard presents the following arguments for our consideration:

> I. THE COURT FAILED TO CONSIDER CRUCIAL AMENDMENTS TO THE RELEVANT STATUTE WHEN IT MIS[S]TATED THE LAW.
>
> II. THE FATHER'S FUNDAMENTAL LIBERTY INTEREST SHOULD NOT HAVE BEEN EXTINGUISHED WHEN THE CHILDREN WERE CARED FOR BY THEIR MATERNAL GRANDMOTHER AND THE COURT FAILED TO ADEQUATELY CONSIDER KINSHIP LEGAL GUARDIANSHIP.
>
> III. IT IS UNNECESSARY TO TERMINATE A POSITIVE PARENTAL RELATIONSHIP WHEN THE CHILDREN'S PLACEMENT IS A PSYCHOLOGICAL PARENT.

II.

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012).

11

"A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015) (citing F.M., 211 N.J. at 448). Our Supreme Court has noted in respect to termination of parental rights cases, "a trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448. This enhanced deference is particularly appropriate where the court's findings are founded upon the credibility of the witnesses' testimony. N.J. Div. of Youth & Fam. Servs. v. H.B., 375 N.J. Super. 148, 172 (App. Div. 2005) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to

12

ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). No deference is given to the trial court's "interpretation of the law," which we review de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

A parent has a constitutionally protected right "to enjoy a relationship with his or her child . . . ." In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

When terminating parental rights, the court must consider the "best interests of the child . . . ." K.H.O., 161 N.J. at 347. A petition to terminate parental rights may be granted only if the following four prongs enumerated in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

A-1044-22

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a)(1)-(4).]

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "[T]he cornerstone of the inquiry [under N.J.S.A. 30:4C-15.1(a)] is not whether the biological parents are fit but whether they can cease causing their child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

Here, Judge Jimenez made extensive findings of fact and well-reasoned credibility determinations, and he engaged in a comprehensive, fact-sensitive analysis of all the statutory factors as to the termination of Richard's parental rights. See K.H.O., 161 N.J. at 348. We affirm substantially for the reasons set

forth in his thorough and well-reasoned opinion. We add only the following comments.

First, we reject Richard's arguments the court erred by failing to consider KLG as an alternative to termination of parental rights. He argues that under the 2021 amendments to N.J.S.A. 30:4C-15.1(a)(2), L. 2021, c. 154, § 9, and the KLG statute, N.J.S.A. 3B:12A-6(d)(3), L. 2021, c. 154, § 4, KLG is preferred to termination of parental rights, and that the amendments are inconsistent with giving effect, as Richard contends the court did here, to the resource parent's preference for termination of parental rights and adoption over KLG. Thus, he argues the court erred by determining termination of their parental rights is in the best interests of the children.

The 2021 amendment to N.J.S.A. 30:4C-15.1(a)(2) deleted the second sentence of the second prong of the best interests standard. Prior to the amendment, the second prong of the standard read as follows:

> The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child[.]
>
> [N.J.S.A. 30:4C-15.1(a)(2) (emphasis added).]

The 2021 amendment thus deleted the provision stating, "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child[.]"

The 2021 amendments also modified the KLG analysis. L. 2021, c. 154, § 4. Prior to the July 1, 2021 effective date of the amendments, the KLG statute, N.J.S.A. 3B:12A-6(d)(3), required a determination by clear and convincing evidence that adoption was neither feasible nor likely before awarding KLG. In part, the statute provided a court could appoint a caregiver as a KLG, if "based on clear and convincing evidence" a series of express conditions were satisfied, including "adoption of the child is neither feasible nor likely." N.J.S.A. 3B:12A-6(d)(3). The 2021 amendment deleted that condition, making KLG an equally available permanency plan for children in Division custody, like Erica and Ricky. L. 2021, c. 154, § 4; N.J.S.A. 3B:12A-6(d)(3).

In New Jersey Division of Child Protection and Permanency v. D.C.A., we rejected a claim the 2021 amendment to the second prong of the statutory standard under N.J.S.A. 30:4C-15.1(a)(2) barred the court's consideration of "all evidence concerning a child's relationship with [the] resource caregiver[] . . . even in the context of the other prongs of the best-interests standard." 474 N.J.

16

Super. 11, 25-26 (App. Div. 2022). We explained, "[t]he Legislature did not alter the other components of the best interest standard[,]" and we rejected an interpretation of "the amendments to prong two to mean that such a bond may never be considered within any part of the best interests analysis." Ibid. We further determined "the statute still requires a finding that '[t]ermination of parental rights will not do more harm than good[,]'" id. at 26 (quoting N.J.S.A. 30:4C-15.1(a)(4)), and stated, "[t]he court must make an evidentiary inquiry into the status of children in placement, to determine whether the child[ren] [are] likely to suffer worse harm in foster or adoptive care than from termination of the biological parental bond." Ibid.

We also noted the amendments to the KLG statute were intended "to make it clear . . . that the judge should be considering the totality of the circumstances in every case in evaluating facts and making a particularized decision based on the best interests of each child . . . ." Id. at 28 (citation omitted). We explained a court should not limit its focus to "the harm from separation from foster families . . . at the exclusion of other factors." Ibid. (citation omitted). We concluded the modification to N.J.S.A. 30:4C-15.1(a)(2) "requires a court to make a finding under prong two that does not include considerations of caregiver bonding, and then weigh that finding against all the evidence that may be

17

considered under prong four—including the harm that would result from disrupting whatever bonds the child has formed." Id. at 29.

Even if Judge Jimenez considered the bonding evaluation in the context of prong two, the misapplication was harmless error. "The harmless error standard requires that there be some degree of possibility that [the error] led to an unjust result." State v. Lazo, 209 N.J. 9, 26 (2012). The record supports the finding that Richard refused to address his issues that caused the children harm and he was unable to provide them a safe and stable home both now and in the foreseeable future. The judge's consideration of the bonding evaluation in prong four was wholly appropriate and supported the correct conclusion that termination of parental rights would not do more harm than good. Thus, the error in considering bonding in prong two did not lead to an unjust result.

Moreover, contrary to Richard's claims, the amendments did not require the imposition of KLG over termination and adoption under the circumstances presented. As Judge Jimenez explained, KLG was not acceptable to Dolores, there was no other viable caretaker who sought or was available for KLG, and a coparenting arrangement was not feasible or in the children's best interests because of Richard's inability to parent. Therefore, the totality of the circumstances detailed in the judge's painstaking analysis supported his

18

conclusion that the Division presented clear and convincing evidence termination of Richard's parental rights was appropriate under each prong of the best interests standard.

To the extent we have not expressly addressed any issues raised by defendant, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1044-22