# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1923-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

B.W.,

     Defendant-Appellant,

and

K.C.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.C.,
a minor.

_____

Submitted September 18, 2024 – Decided October 17, 2024

Before Judges Rose and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0010-24.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Louis W. Skinner, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Lakshmi Barot, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor S.C. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer M. Sullivan, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant B.W. (Brandy) appeals from the February 7, 2024 judgment of guardianship terminating her parental rights to her daughter, S.C. (Stephanie), born in January 2022.[1] Stephanie's biological father, defendant K.C. (Keith), does not appeal from the same judgment terminating his parental rights. The Law Guardian supports the termination on appeal as it did before the trial court.

---

[1] We use initials and pseudonyms to identify the parties, the child, and others to protect the child's privacy and because records relating to proceedings held pursuant to Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

2                                                                                    A-1923-23

Based on our review of the record, the judge's extensive findings of fact and conclusions of law, and Brandy's arguments, we are convinced the judge correctly determined the Division of Child Protection and Permanency proved by clear and convincing evidence termination of Brandy's parental rights is in the child's best interests. We therefore affirm.

I.

The facts and procedural history of the underlying matter are fully set forth in the trial judge's February 6, 2024 oral opinion, which we incorporate by reference. We highlight the following facts relevant to this appeal.

The Division received a referral about newborn Stephanie in January 2022. Brandy tested positive for THC (a marijuana metabolite) and COVID-19. Stephanie was born premature and placed in the neonatal intensive care unit.

When the Division met with Brandy in the hospital, she reported she discovered her pregnancy in September 2021 and last used marijuana in October 2021. She stated she had been living with Keith, whom the Division was unable to contact for over a week.

Brandy was discharged from the hospital before Stephanie. The plan was to have Stephanie, when she was cleared for discharge, be released to Brandy.

Because she lacked the necessities to care for an infant, the Division ordered supplies including a car seat, crib and sheets to be delivered to Brandy's home.

In a pattern that continued throughout the litigation, Brandy could not be located for days after her discharge. She did not answer or return phone calls from Division workers and did not respond to their numerous attempts to arrange for delivery of the baby items. At the Division's request, police conducted a welfare check at Brandy's home but could not contact her.

Two weeks after her birth, Stephanie was nearing her anticipated discharge date and Brandy had only visited her once. Because Brandy could not be located, the Division applied for custody, care and supervision of Stephanie via a Dodd[2] removal. The day Stephanie was cleared for release, the Division finally contacted Brandy and she consented to the Division's custody, care and supervision of Stephanie.

The Division explored relative placement for Stephanie. Prior to Stephanie's release from the hospital, Brandy moved out of Keith's house and intended to live with her grandmother, M.D. (Marilyn), in Philadelphia. Marilyn

---

[2] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

initially expressed an interest in being a licensed resource parent but never completed the necessary application to start the interstate process. Keith's mother did not want to be involved. Keith told the Division caseworker he thought Brandy should have terminated the pregnancy, and he did not want to be involved with Stephanie. Lacking any available options for relative placement, the Division placed Stephanie with a non-relative resource home upon her discharge from the hospital.

By FN[3] order dated January 31, 2022, Brandy was permitted supervised visits with Stephanie, twice a week for two hours. Brandy was also required to comply with services as recommended by the Division, including participating in psychological and substance abuse evaluations, meeting with a domestic violence liaison, and submitting to random urine screens. That same day, Brandy tested positive for THC, alcohol, opiates and oxycodone.

Shortly after Stephanie's discharge, the Division met with Brandy and Marilyn, who agreed to be assessed as a placement for Stephanie. With Brandy's input, the Division set a schedule for her visits with Stephanie.

From their inception, the visits were sporadic at best. Brandy skipped the second date without contacting the Division, missed half the dates over the next

---

[3] The Family Part's FN docket consists of abuse and neglect matters.

three months, and did not attend any visits in July 2022. She often confirmed a visit but then failed to show and was frequently belligerent to Division staff. She gave varying reasons for missing visits, including car trouble, oversleeping and giving Stephanie "more time to recover from her diaper rash." Because Brandy reported having car trouble, the Division purchased a public transportation pass but the assistance did not improve her attendance at visits.

In October 2022, Division workers met with Brandy to again discuss her transportation issues. Although she agreed to be more consistent with visits by utilizing public transportation instead of unreliable third parties, she attended only six visits from October to December.

In December, Division workers again met with Brandy to address her sporadic attendance. Brandy admitted she had not looked into taking public transportation and did not even know where to go, so the caseworker explained how to get to the Division's office using the transportation system. Despite the assistance, Brandy only attended four visits from January through March 2023. Although she confirmed some visits, she did not attend any from March through October. She also eschewed the Division's attempts to meet with her to give her additional public transportation passes. When the caseworker was finally able

A-1923-23

to provide them to Brandy, she exhausted the funds on personal travel instead of traveling to visits with her daughter.

Between October and December 2023, Brandy attended seven to eight visits. Because of her inconsistency in attending supervised visits, by the time of trial, Brandy never progressed to unsupervised visits.

Brandy also was inconsistent with her substance abuse and mental health treatment. Shortly after the initial Dodd order, she underwent a substance abuse evaluation, had positive screens for opiates and THC, and later disclosed she had been struggling with opiate use for years. The evaluator diagnosed Brandy with opiate and cannabis use disorder and recommended she participate in intensive outpatient treatment (IOP).

The Division arranged for Brandy to attend an IOP, but she was discharged within three months for non-compliance. After she failed to show for four subsequently scheduled substance abuse evaluations, the referral was returned. After August 2022, Brandy became non-compliant with court-ordered drug screens and failed to appear for substance abuse evaluations on numerous occasions.

In spring 2023, Brandy was twice referred to an IOP and then discharged. In June 2023, she completed a substance abuse evaluation but refused to submit

to a drug screen. She was again diagnosed with opiate use disorder and recommended to engage in an IOP, and the Division referred her to a program in Philadelphia that accepted her insurance, but she failed to attend. She sporadically engaged in treatment at another program until she was discharged unsuccessfully in January 2024.

During this time, on the occasions Brandy submitted to a screen, she tested positive for some combination of THC, alcohol, opiates, oxycodone and buprenorphine.

Brandy was also periodically non-compliant with court-ordered mental health treatment. Shortly after the initial Dodd order, she underwent a psychological evaluation. The evaluator diagnosed Brandy with adjustment disorder with disturbance of mood and post-traumatic stress disorder and recommended she attend therapy to develop stronger coping skills and in-home supports to acclimate her to daily parenting.

Brandy then engaged in therapy with Gregory C. Gambone, Ph.D. She treated with Dr. Gambone for eight sessions and continued to exhibit low frustration tolerance and problems with substance abuse requiring further treatment. She failed to attend the next two sessions with Dr. Gambone and was terminated from therapy.

From March to September 2023, Brandy was placed on telehealth sessions on an as-needed basis because she was also engaged in individual therapy in Pennsylvania; however, she was subsequently discharged from the therapy program. In December 2023, she failed to appear for an intake for virtual parenting classes, even after rescheduling the time for her convenience.

The Division's efforts to secure kinship placement for Stephanie were ultimately unsuccessful. Stephanie's maternal and paternal grandmothers were ruled out as viable options for lack of interest or engagement with the interstate approval process to become a resource parent.

With Stephanie having been in placement for over a year and no viable alternative arrangement with family members, the Division requested and was granted a permanency goal change to termination of parental rights followed by resource parent adoption, with a concurrent plan of reunification with Brandy. The Division filed its guardianship complaint on August 23, 2023, after which the judge terminated the FN litigation and held an initial hearing of guardianship.

In anticipation of the termination hearing, Melanie A. Freedman, Ph.D., conducted psychosocial and bonding evaluations. Dr. Freedman diagnosed Brandy with severe opiate use disorder, cannabis use disorder, mild to moderate

9

post-traumatic stress disorder and possible hypomania. Dr. Freedman found Brandy's ongoing unremediated substance abuse was the primary risk to her parenting Stephanie, given her years long history of substance abuse and demonstrated unwillingness to make efforts to change her pattern of behaviors.

Dr. Freedman found Brandy's emotional dysregulation to be an additional risk. Brandy presented as emotionally overwhelmed and stressed, and not able to handle her own responsibilities nor attend to a two-year-old child's daily needs. Dr. Freedman noted Brandy arrived for the interview late and annoyed. She was loud and agitated, rolled her eyes and cursed, and did not take her headphones off for the first thirty minutes. She became despondent and teary, then alternating between smiling and crying. Dr. Freedman opined Brandy's rapidly shifting emotional responses were out of proportion for the topic being discussed and, although Brandy had engaged in some therapy, she did not demonstrate any of the coping skills she should have acquired.

Dr. Freedman also considered Brandy's inconsistent visits with Stephanie, which she found indicative of her inability to commit to the demands of full-time parenting. She further found it unlikely Brandy could provide a minimal level of safe parenting in the foreseeable future, on a logistic, emotional or psychological level.

10

Dr. Freedman's bonding evaluation determined Stephanie did not have a critically important attachment relationship with Brandy. Brandy never provided for her day-to-day care or even consistently visited her and, as a result, Stephanie did not look to her for security as a reliable and present individual in her life.

By contrast, Stephanie had a strong and positive attachment with her resource parents, with whom she had resided since she was two weeks old. They met her daily needs, and she looked to them as her caregivers. Dr. Freedman determined Stephanie would suffer little to no harm if Brandy's parental rights were terminated and the resource parents had a strong ability to mitigate any harm. Dr. Freedman supported the Division's plan for termination of parental rights followed by adoption by the resource parents because it would provide Stephanie reliable, safe and stable caregiving.

The guardianship trial was conducted on February 6, 2024. The Division presented the testimony of Dr. Freedman, whom the court accepted as an expert in clinical and forensic psychology; H.P. (Helen), Stephanie's resource parent; and the Division's adoption worker. The Law Guardian did not present any witnesses or evidence, and Brandy testified on her own behalf.

11

The next day, the judge issued a comprehensive and thorough oral decision on the record, wherein she summarized the procedural history and made detailed findings of fact as to each of the required elements of the best-interests-of-the-child standard set forth in N.J.S.A. 30:4C-15.1(a). Based on those findings, the judge concluded the Division sustained its burden of proving by clear and convincing evidence it was in Stephanie's best interests to terminate defendants' parental rights.

The judge found Dr. Freedman's testimony "credible, compelling, insightful and based on the record." She afforded Dr. Freedman's testimony "extremely substantial weight" not just because she was the only expert who testified, but because she provided "numerous examples as the bases for her conclusions . . . [and] lengthy explanations" that were grounded in both the record and her observations. The judge noted Dr. Freedman "gave insightful explanations of why she concluded the way she did, and with respect to the bonding evaluation she gave [Brandy] every single benefit of the doubt."

The judge found Stephanie's safety, health and development would be endangered by the parental relationship. Brandy's long-standing, unmitigated substance abuse, her largely untreated mental health issues, and her inability to provide a safe, stable home rendered her unable to parent Stephanie.

The judge also found Brandy was unwilling or unable to eliminate the harm facing Stephanie. She did not avail herself of visits with Stephanie, only attending twenty-one visits from October 2022 to January 2024. She was noncompliant with substance abuse and mental health treatment, evaluations and screens, and continued to use substances throughout the litigation. She failed to attend domestic violence or parenting evaluations. Thus, the judge found Brandy had not "demonstrated . . . she is able, willing or interested in eliminating the harm facing [Stephanie] during the past two years, stepping up to the plate to provide a safe and stable home for the child, remediating her substance abuse problems, fully engaging in the services, [or] finding housing."

The judge further opined the delay of permanent placement would add to Stephanie's harm. Because Brandy "ha[d] not made . . . really any progress from when [Stephanie] was removed based on her own inaction over two years ago," it was unlikely she would be able to parent Stephanie in the near future or at all. The judge noted that Stephanie had been in placement for two years, where she was thriving, and delaying her the permanency of that care would cause her further harm.

The judge also found the Division made reasonable efforts to provide services to Brandy, despite her resistance. The judge credited the testimony of

the Division worker, whom she found credible because of her familiarity with the record and personal knowledge of the case. The judge found the record was "replete" with numerous phone calls, visits and meetings scheduled by the Division, many of which Brandy ignored, rescheduled or failed to attend. The Division arranged for treatment and therapy, from which Brandy was terminated for non-compliance. Just as the Division had difficulties in delivering Brandy baby supplies at the inception of the case, its efforts to provide Brandy transportation passes were similarly rebuffed, with Brandy ignoring, rescheduling and failing to show. The judge noted the Division was not required to "go to her door, hold her hand, and take her to the office," and had made reasonable and numerous efforts to engage her in services through referrals and re-referrals, assisting her with public transportation, picking her up and dropping her off at her home, and meeting her at various places in Philadelphia.

The judge also considered alternatives to placement but found they were not viable. Helen testified the Division had discussed with her the option of kinship legal guardianship (KLG) multiple times. She understood the differences between KLG and adoption, and "expressed an unequivocal willingness to adopt." Helen explained she and her spouse have two other adopted children and they wanted Stephanie to be part of that stable family unit.

14

She was open to continue visits with Brandy but wanted to have "the say" to ensure stability and protect Stephanie's best interests. Helen noted Stephanie had been with them her entire life and they had a strong bond. Brandy had been inconsistent with visits, which disappoints a child and impacts the entire family unit. The judge found Helen's answers to be "compelling" and "insightful," and her decision on KLG to be informed and represented Stephanie's best interests.

Finally, the judge considered Brandy's inability to parent now or in the foreseeable future, along with Stephanie's need for permanency and her bond with the resource parents, in whose care she was thriving. She found the Division's testimony and evidence demonstrated that the termination of parental rights would not do more harm than good, and adoption by the resources parents was in Stephanie's best interests.

On appeal, Brandy challenges all four prongs of the best interest test.

II.

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012). "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super.

15

363, 368 (App. Div. 2015) (citing F.M., 211 N.J. at 448). Our Supreme Court has noted in respect to termination of parental rights cases, "a trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448. This enhanced deference is particularly appropriate where the court's findings are founded upon the credibility of the witnesses' testimony. N.J. Div. of Youth & Fam. Servs. v. H.B., 375 N.J. Super. 148, 172 (App. Div. 2005) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). No deference is given to the trial court's

"interpretation of the law," which we review de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

A parent has a constitutionally protected right "to enjoy a relationship with his or her child . . . ." In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

When terminating parental rights, the court must consider the "best interests of the child." K.H.O., 161 N.J. at 347. A petition to terminate parental rights may be granted only if the following four prongs enumerated in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a)(1) to (4).]

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "[T]he cornerstone of the inquiry [under N.J.S.A. 30:4C-15.1(a)] is not whether the biological parents are fit but whether they can cease causing their child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

Here, the judge made extensive findings of fact and well-reasoned credibility determinations, and she engaged in a comprehensive, fact-sensitive analysis of all the statutory factors as to the termination of Brandy's parental rights. See K.H.O., 161 N.J. at 348. We affirm substantially for the reasons set forth in her thorough and well-reasoned opinion. We add the following comments.

First, we reject Brandy's arguments the trial judge erred in finding the Division met the first two prongs of the best interests test. Regarding prong one, Brandy argues the only harm Stephanie suffered was that she was born premature and Brandy tested positive for marijuana, which does not satisfy the standard under N.J. Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1 (2013). This contention oversimplifies the judge's factual findings and conflates the standard of harm required to sustain a Title 9 action with the standard in a Title 30 action. We are satisfied the judge's conclusion that Stephanie's well-being was endangered by her parental relationship with Brandy was well-supported in the record.

Regarding prong two, Brandy argues the Division provided assistance that was ultimately too little, too late. The Division's efforts are "not measured by their success," but "must be assessed against the standard of adequacy in light of all the circumstances of a given case." In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999). We are unpersuaded by Brandy's contentions because, as the trial judge found, the record was replete with the Division's timely efforts to assist Brandy in resources, services and transportation, which were often frustrated or delayed by Brandy's own non-responsiveness.

19                                                                    A-1923-23

Brandy further claims the trial judge erred in applying the 2021 amendments to N.J.S.A. 30:4C-15.1(a)(2) and the KLG statute, N.J.S.A. 3B:12A-6(d)(3), and in relying on the resource parents' wishes in determining the fourth prong. We are unpersuaded by either argument.

The 2021 amendment to N.J.S.A. 30:4C-15.1(a)(2), which is the second prong of the best interests test concerning harm, deleted the second sentence that read, "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child[.]" See L. 2021, c. 154. The 2021 amendments modified the KLG analysis by putting KLG on an equal footing with adoption as an available permanency plan for children in Division custody. Ibid.

We are satisfied the judge's decision here rested in the confines of the amended statutes. In her analyses of both prongs three and four, the judge found KLG was not a viable option. While she considered the resource parents' informed position on KLG, their input was not the determinative factor. Rather, as she was required to do, the judge focused on Brandy's demonstrated inability to parent Stephanie in the near future or at any time. She recognized the length of time Stephanie had been in a temporary resource home and her need for and right to permanency. Therefore, the totality of the circumstances detailed in the

judge's painstaking analysis supported her conclusion that the Division presented clear and convincing evidence termination of Brandy's parental rights would not do more harm than good and was in Stephanie's best interests.

To the extent we have not expressly addressed any issues raised by defendant, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1923-23